UNITED STATES, Appellee

v.

ANDREW C. CLISSON, Technical Sergeant, U. S. Air Force, Appellant

5 USCMA 277, 17 CMR 277

No. 4635

Decided December 17, 1954

278

 
 ██ 
 

Col A. W. Tolen, USAF, and Maj John J. Ensley, USAF, for Appellant.
Lt Col Harold Anderson, USAF, and 1st Lt Anthony Ortega, Jr., USAF, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

This case concerns the legality of the initial post-trial review of the accused's conviction.

The accused was tried by a general court-martial convened by the Commander, Flying Training Air Force, whose Headquarters are in Waco, Texas. The court sat at Ellington Air Force Base, Houston, Texas. Pursuant to the appointing orders, Major Dean E. Delafield prosecuted the case as trial counsel.

After the accused's conviction and in compliance with a Flying Training Air Force regulation, Major Delafield prepared a report entitled "Post-Trial Interview." This report sets out the highlights of the accused's civilian and military background. In respect to the latter, it appears that, prior to his transfer to Ellington Air Force Base, the accused was assigned duties of a highly technical nature. Among his accomplishments in this field was the perfection of the installation of aural null equipment for link trainers. This earned the accused a special commendation. Parenthetically, at the time of commission of the offenses, the accused was acting as prison sergeant at the base stockade. The report also related the substance of interviews with the accused's squadron commander, the prison chaplain, and the confinement officer. The Chaplain specifically recommended that the accused be retained in the service, because he believed that the accused's personal problems, which apparently led to the commission of these offenses, could be eliminated; and that, if properly utilized, the accused's unique abilities would be of great value to the Air Force. The confinement officer does not appear to have made any specific recommendations, but the report notes that it was his opinion "the accused has a fine character. That evidently family trouble had caused the recent troubles of the accused, and he would like to speak a good word for him." The squadron commander also adverted to the accused's special capabilities, but he indicated he did not believe that the accused's personal problems were solved. Major Delafield, however, advocated approval of the entire sentence imposed by the court. In the concluding parts of his report, he said:

". . . However, the accused is a person who, in the present state of mind, cannot be trusted. It is believed that he has suffered considerably with his family problems. It was evident that he dislikes his wife very much by the fact that he refuses to talk about her. There appears to be an emptiness in his life which cannot be filled by work. He is highly capable, but I do not believe the military can offer him any type of work which would relieve his inward tension created by his family problems.

"Considering the seriousness of the offenses of which this accused stands convicted, the fact that he was given an opportunity within the last half year to correct his attitude and to display his trustworthiness, in which he failed by committing these present acts, and because the accused is not a person who will be able to overcome his family situation within the forseeable future, it is recommended that the sentence as adjudged by the court be approved."

Major Delafield signed the report as "Staff Judge Advocate." It was forwarded to the Commander, Flying Training Air Force, with the record of trial. A paraphrase of it constitutes the Clemency Section of the review by the Commander's staff judge advocate. That part of the Delafield report which is quoted above is also quoted in the

279

staff judge advocate's review. The latter ends with the following remark:

"... In my opinion the sentence imposed by the court in this case upon conviction of the accused for offenses for which punishment of dishonorable discharge and confinement for over ten years could have been imposed constitutes sufficient clemency action and I agree with the conclusions of the Wing Staff Judge Advocate that the sentence should be approved and executed."

In United States v. Coulter, 3 USCMA 657, 14 CMR 75, we pointed out that under Article 6(c), Uniform Code of Military Justice, 50 USC § 556, a trial counsel may not thereafter act as staff judge advocate to the reviewing authority. The Government contends that the Coulter case is distinguishable because Major Delafield did not at any time act as staff judge advocate to the Commander, Flying Training Air Force, the initial reviewing authority in this case. Under the facts of this case, the distinction is one of form and not of substance.

Article 6(c) of the Uniform Code is designed to assure a fair and impartial review. Fairness and impartiality are demanded not only with respect to the law, but in connection with the sentence. Here, as in United States v. Coulter, supra, we do not doubt the personal integrity of trial counsel, but we cannot overlook the fact that his previous antagonistic role prevents his exercising that degree of impartiality required by the Code.

No doubt trial counsel may be asked for his personal recommendations regarding the sentence, and these may be considered by the staff judge advocate even though they are colored by the former's previous connection with the case. But that is not the situation here. It is apparent that Major Delafield's report was not considered by the convening authority as that of a trial counsel, but rather as that of the staff judge advocate of the command at which the court sat. Undeniably, it was expressly described as a report emanating from the person occuying that office.

**280**

Implicit in that description is a representation that the report was prepared by a person having no disability by reason of previous association with the case. Therefore, it seems that the reviewing authority's staff judge advocate's report is so tainted by the impropriety of Major Delafield's report as to fall short of that degree of impartiality contemplated by Article 6 of the Uniform Code.

Having determined that prejudicial error is present in the post-trial review, the question arises as to what corrective action should be taken. Concededly, the error did not deprive the accused of important pretrial protections. It did not in any way affect the findings of guilt or the sentence adjudged by the court. Consequently, it appears appropriate to return the case for corrective action to the level of proceedings at which the error occurred. See United States v. Sonnenschein, 1 USCMA 64, 1 CMR 64. True, in United States v. Crunk, 4 USCMA 290, 15 CMR 290, and United States v. Coulter, supra, we thought it advisable, in the interests of justice, to order a rehearing rather than return the case to the convening authority for corrective action. Cf. United States v. Dean, 5 USCMA 44, 17 CMR 44. But, in the instant case, we believe that the accused will have the full benefit of all protections afforded him if we direct a new review and a reconsideration of the case by the convening authority on the basis of that review. Accordingly, we reverse the decision of the board of review and return the case to the convening authority. We order that, in accordance with Article 61, Uniform Code of Military Justice, 50 USC § 648, he refer the record for post-trial review to a qualified staff judge advocate who has had no previous connection with this case, and who will review the record with the impartiality and fairness required by the Uniform Code.

BROSMAN, Judge (concurring):

I fully concur in the opinion of the Chief Judge. Certainly I agree with him that there are differences between the present one and the Coulter case.

I am sure that we do not find here an instance which falls within the purview of the statement found in my concurring opinion in Coulter to the effect that a convening authority is in no way limited as to sources of information concerning an accused, but properly may obtain the opinion of the trial counsel—or that of any other person for that matter—on the question of the desirability of clemency action.

Flying Training Air Force Regulation 111-3 expressly provides that "where a punitive discharge has been adjudicated, the Wing Staff Judge Advocate or one of his assistants" at the station where the hearing was held shall conduct a post-trial interview with the accused—and requires as well that a report thereof shall accompany the record of trial during *all* of its subsequent travels. Major Delafield, the trial counsel, was also the Wing Staff Judge Advocate at Ellington Air Force Base, Houston, Texas, an installation under the command of the convening authority, who was the Commanding General, Flying Training Air Force, headquartered at Waco, Texas. The report of the personal interview with the accused held by Major Delafield was prepared pursuant to FTAF Regulation 111-3, and it is clear that the interview itself was conducted by reason of the latter's assignment as Wing Staff Judge Advocate. Certainly the detailed report of "Post-Trial Interview," demanded by Regulations and accomplished by this officer, would have constituted an unusual measure indeed if it sought merely to voice the opinion of the trial counsel who had prosecuted the accused. Moreover, the review of the convening authority's staff judge advocate in Waco refers to Major Delafield only as Wing Staff Judge Advocate—and never as trial counsel.

In Coulter I emphasized the importance of the clemency aspect of a staff judge advocate's review and recommendation. The United States Air Force has consistently—and commendably—recognized the importance of post-trial clemency information, and the need for furnishing to reviewing authorities a complete picture of the accused. See Conference of the Judge Advocate General, United States Air Force, Bolling Air Force Base, April 9–10, 1951, pages 36–37; Military Justice Circular, United States Air Force, Sec. 502(3), July 31, 1953. Indeed, the importance of the post-trial interview is deemed so substantial in this Armed Service that "no review will be considered complete unless it contains information reflecting such an interview or explaining why it could not be accomplished." Military Justice Circular, idem. FTAF Regulation 111-3 simply implements for the command with which we are concerned the directive language of the Military Justice Circular.

The importance attached to the post-trial interview signifies to me that—as in Coulter—we cannot permit its accomplishment by the very officer who prosecuted the accused, and who may suffer from a certain natural, understandable, and quite unconscious bias connected with that role. It must be evident that I impute no sort of impropriety or concealment to Major Delafield, nor any necessary element of unreasonableness to his evaluation of the accused. Instead, I simply cannot bring myself to approve a practice which operates to place a judge advocate officer in what may be inconsistent positions. The officials located at Flying Training Air Force headquarters enjoyed no opportunity to meet and observe the accused, and did not possess the basis for judgment in this area which only personal contact can afford. Rather, both the personal interview and its evaluation were accomplished by one who had previously occupied a role antagonistic to Clisson. It may be noted too that, in addition to the effect of this official antagonism on the *interviewer,* there exists more than a slight possibility that the *accused* may also be affected subjectively. Indeed, he may be incapable of complete communication to his erstwhile prosecutor.

III

In light of the foregoing, I do not feel that the present instance is one in which the accused has received that full and fair review of his case intended

by the Code and the Manual for Courts-Martial. In addition, his case did not secure the full consideration contemplated by the two directives which governed the Air Force personnel who dealt with the case. Both the Military Justice Circular and FTAF Regulation 111–3, which implemented it, sought to assure a complete and fair post-trial interview, wholly free from risk of bias. Their purpose would in large measure be defeated if such interviews are to be conducted by persons who, by reason of prior contacts with the case, may have prejudged clemency prospects. Accordingly, I consider that the practice reflected in the present case violates as well the appropriate Air Force directives.

Admittedly my views may place a modest additional administrative burden on far flung commands like the Flying Training Air Force—at some of whose smaller installations few lawyers may be stationed. However, I am sure that, if a post-trial interview was worth providing in the first place—a question on which I entertain no doubt whatever—then it must be conducted under conditions which preserve its value. It should not serve as a basis for review of the sentence by the convening authority, by a board of review, by The Judge Advocate General, and even by the Secretary of the Department concerned unless it is—as it purports to be—a fair and untainted appraisal of the advisability of clemency action made after personal consultation with the accused.

### IV

Because there is error here affecting the substantial rights of the accused, it is manifest that I cannot agree to affirming the decision of the board of review. Yet it will be noted that there has been no suggestion in this case that either the findings or the sentence—as the latter came from the court—were touched by error as a result of the questioned post-trial interview. Under such circumstances, service boards of review have, on occasion, provided that the infected staff judge advocate's review be superseded by one free from suspicion. United

States v. Eisenhard [CM 372982], 16 CMR 315; United States v. Bryant [ACM 8270], 16 CMR 747. Finding nothing in the nature of the error here which merits more severe reversive action, I am willing to adopt a like alternative in this case. After all, I cherish no wish to throw out the baby with the bath water. Accordingly, I concur in the opinion of Judge Quinn.

LATIMER, Judge (dissenting):

I dissent.

### I

I dissented in United States v. Coulter, 3 USCMA 657, 14 CMR 75, and I there pointed out particularly that a rehearing should not be granted when, by every known standard, an accused was entitled to no more than a reconsideration of the sentence. My associates have now joined me in that regard, but they have opened up new vistas through which they find error and prejudice. In order to show that the Court has gone much further to reverse this conviction than it did to set aside the one in Coulter, supra, I state the facts I find in the record. In doing so, I recognize I may repeat some already mentioned.

Accused was charged with, and found guilty of, stealing $134.00 from one enlisted man, and $75.00 from another. He was a prison sergeant and they were prisoners. The evidence for the Government established clearly both crimes and the accused did not deny their commission except by his plea of not guilty. He elected not to testify at the trial and so the Government's evidence was unrebutted. Furthermore, it was fortified by a written, and duly sworn to, pretrial affidavit which was voluntarily given and in which the accused admitted every element of both offenses. His only excuse for his criminal acts must be found in his claim of excessive drinking over a considerable period of time and his alleged matrimonial unhappiness. At the time of the violations he was a technical sergeant, 42 years of age, and he had completed at least eleven years of military service. His military record for the two years immediately prior to these offenses had been highly unsatisfactory.

After the trial, Major Delafield, the Wing Staff Judge Advocate of Ellington Air Force Base, who had acted as trial counsel at the general court-martial of the accused, conducted a post-trial investigation, in compliance with FTAF Regulation 111–3 and by the direct order of the convening authority. He was not the staff judge advocate on the latter's staff and his investigation and review dealt solely with matters of clemency. The Major interviewed the accused, his squadron commander, the confinement officer and the prison chaplain, and reported the information received from each of these officers. He then forwarded his report, together with his conclusions and recommendations, to The Staff Judge Advocate of the Flying Training Air Force at Waco, Texas. In signing the report he identified himself as Staff Judge Advocate of Ellington Air Force Base. For purposes of keeping the respective headquarters identified properly, it is necessary to state that the Commander, Flying Training Air Force, Waco, Texas, was the officer who exercised general court-martial jurisdiction, and the one who convened the court-martial and designated Major Delafield as trial counsel.

Upon receipt of the entire file at the higher headquarters, Lieutenant Colonel Porter, who was the Assistant Staff Judge Advocate on the staff of the convening authority, prepared a complete review of the record in accordance with the provisions of Article 61, Uniform Code of Military Justice, 50 USC § 648. This latter report, which was concurred in by Colonel Hayes, the Staff Judge Advocate of the convening authority, touched on all events and incidents happening during the court-martial proceedings. It included summaries of the evidence on each of the charges; an evaluation of the evidence in the light of the necessary elements of the offenses; comments on the rulings of the law officer at the trial; references to some of the instructions given; statements on the legality of the findings and sentence returned; recitations of the accused's civilian and military history; and detailed information relating to clemency. In discussing the clem-

ency possibilities, Lieutenant Colonel Porter's review referred to the information obtained by Major Delafield from other Wing officers but it suggests an independent evaluation and decision on clemency by him. In his report to the convening authority he stated as follows:

"In a review of the foregoing reports and the opinions of the officers as to the capabilities of Airman Clisson, there appears to be no doubt that he is exceptionally well qualified in his specialty and capable of performing good duty in the Air Force. However, it also appears that about two years ago Airman Clisson initiated a course of conduct which resulted in the loss of his services to his organizations for nearly eighteen months during which time he was in either an AWOL or confinement status. The fact that he escaped punishment for his previous unauthorized absence of about six months and service of the sentence imposed upon his conviction for that offense because of the faith reposed in him by his supervisors at Ellington Air Force Base does not seem to have been appreciated by him nor to have affected his conduct since that time. In my opinion the sentence imposed by the court in this case upon conviction of the accused for offenses for which punishment of dishonorable discharge and confinement for over ten years could have been imposed constitutes sufficient clemency action and I agree with the conclusions of the Wing Staff Judge Advocate that the sentence should be approved and executed."

The Staff Judge Advocate, Colonel Hayes, concurred with his assistant and the convening authority was then called upon to make his decision. Confronting him at that time was one of the most complete clemency investigations I have ever seen in a court-martial case. At least six officers had expressed their views and the reasons supporting them were handy for consideration by the reviewing officer. He was furnished with every bit of information necessary to render a decision and he was favored with the recommendations of four of-

ficers who had had personal contact with the accused.

In view of that record, the principles by which the Court reaches the conclusion that the Government should be put to the expense of requiring the convening authority to reconsider the sentence of the accused are astonishingly doubtful. The apparent theory seems to be one of penalizing a command because it adopts a standard operating procedure for the collection of post-trial clemency information. The doctrine would be astounding even if the command failed to measure up to its policy requirements, but here it did not violate its own Code, the Manual, or the Uniform Code of Military Justice.

## II

The sole and only issue involved in this case is whether the accused can sustain his assertion that ▇ he suffered some material prejudice to a substantial right when trial counsel was used as a post-trial clemency interviewing officer. In order to sustain that burden, he must first establish the right and then show a fair risk of prejudice from its violation. The Chief Judge states in effect that we are dealing with a violation of the spirit, if not the wording, of the Code. The concurring Judge discards that theory but he plucks a right out of some administrative instructions issued by an Air Force Training Command. I respectfully disagree with both approaches to the problem and my reasons will be advanced so as to first meet the arguments of the Chief Judge and then those of the concurring member.

## III

Article 6 of the Uniform Code of Military Justice, 50 USC § 556, provides as follows:

"(c) No person who has acted as a member, law officer, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investing officer in any case shall subsequently act as a staff judge advocate or legal officer to any reviewing authority upon the same case."

The officer who authored the post-trial clemency review was not encompassed within any of the proscribed categories and so there could not be a violation of a codal provision. The next question then posed is: How and in what manner was the spirit of the Code violated? If any such violations can be conjured up, it must of necessity be this, that the staff judge advocate and the convening authority failed to afford the accused the full and fair review of his conviction and sentence envisioned by the Code. A finding of that failure would fly in the face of the completely fair and exhaustive statement of facts, conclusions of law, and discussions contained in the staff judge advocate's report. It requires a critical examiner to find fault with that document. But, moreover, when it is considered in conjunction with the all-inclusive report on clemency, any contention of an incomplete and unfair review is unsupportable. On the contrary, it is in perfect accord with the record for me to say this: Not only could the convening authority fully and fairly evaluate the accused's guilt, character, reputation, mitigating circumstances, and possibilities of rehabilitation, and arrive at a proper conclusion as to the desirability of retaining him in the service, but so could any other reviewing authority with powers to exercise clemency.

This record is not fragmentary and incomplete. Everything to be said for or against the accused is spread out for the convening authority to consider. Accused's virtues are extolled and his deficiencies are mentioned. A newspaper article praising his accomplishments and opinions of officers, favorable or unfavorable to him, are available in the record. The assignments of the officers are shown; their possible interest, bias or prejudice are fairly reflected; and their evidentiary contributions and conclusions can be assessed for their weight. It is a fair commentary on the work of the interviewing officer to say that at no time in this litigation has anyone suggested any unfairness in the report. Yet my associates say the interviewer's previous antagonistic role as trial counsel prevents him from ex-

ercising that degree of impartiality required by the Code. To support that statement, I find a quotation set out in the principal opinion which commences in the middle of the paragraph and thereby fails to convey both sides of the mental-weighing process used by him. I prefer to quote the officer's thought processes more fully:

"At the time of the post-trial interview in the foregoing case, all officers who were asked to give statements of their opinion of the accused believed him to be an outstanding example of an airman, and that he was a great help to the service, and that he should be retained. The Staff Judge Advocate, Captain Charles L. Carpenter, had the following to say about the accused concerning his intelligence: 'He had an AGCT score of 145. At the request of the undersigned he was re-tested for the purpose of determining his AFQT. He astounded the testing group with the speed in which he took the test and in the fact that he made a perfect score.' Without a doubt the accused is an impressive individual. He is intelligent, talks well, courteous, and possesses a military bearing. It is not difficult to see how the commanding officer, chaplain and the confinement officer come to their conclusions as stated above. However, the accused is a person who, in the present state of mind, cannot be trusted. It is believed that he has suffered considerably with his family problems. It was evident that he dislikes his wife very much by the fact that he refuses to talk about her. There appears to be an emptiness in his life which cannot be filled by work. He is highly capable, but I do not believe the military can offer him any type of work which would relieve his inward tension created by his family problems.

"Considering the seriousness of the offenses of which this accused stands convicted, the fact that he was given an opportunity within the last half year to correct his attitude and to display his truthworthiness, in which he failed by committing these present acts, and because the accused is not a person who will be able to overcome his family situation within the forseeable future, it is recommended that the sentence as adjudged by the court be approved."

Furthermore, reasonable reflection shows that the claimed partiality and unfairness in Major Delafield's report, aside from being highly conjectural, must be transposed into an effect of sufficient impact on the staff judge advocate's report that we can hold it, too, is vulnerable to a claim of partiality. That can only be done in this instance by building a minuscule deviation into a compelling force.

It is to be remembered that this clemency report had to pass through the crucible of analyses by both the staff judge advocate and the convening authority. They were competent to read, understand, and evaluate its contents; and assuming, arguendo, that the interviewer had a persecuting complex, they were cognizant of his participation in the case and weighed his recommendation accordingly. The Chief Judge contends otherwise; but he must give no consideration to the orders appointing the court and the trial counsel, and to the subsequently dated letter order addressed to Major Delafield as trial counsel of this particular court in which he is given instructions on the proper method of presenting evidence peculiar to this case, directed to dispose of the case as soon as reasonably possible, and, in the event of conviction, ordered to furnish the post-trial clemency report. The letter was prepared in the office of the staff judge advocate of the convening authority and carried the command line of the general. Someone in that headquarters was well informed that trial counsel was directed to obtain the clemency report, and it is the sheerest speculation to conclude it was not the staff judge advocate, particularly when the letter bears his code designation. After all, section heads have some knowledge of the affairs of their section and the assignments of legal officers in subordinate commands.

When I reach the heart of the Chief Judge's opinion, I find it supported only by the assumed possibility that the ac-

cused might have been unduly dealt with because the reporting officer signed the report as a staff judge advocate and not as trial counsel. That seems to me to be making much ado over trifles, as the real test of fairness is not measured by the title of the reporting officer. I suggest it is more apt to be determined by the body of the document. But supposing, for the sake of argument, the convening authority did not happen to consider the cloak the reporting officer was wearing—is that alone sufficient to require a reappraisal of the sentence in this case? This accused has been convicted fairly and justly. No one contends he is innocent of the charge or that he should escape punishment. Moreover, it is not remotely suggested that the punishment imposed was inappropriate. The sole issue now being bandied about is based on nothing more or less than a remote contingency that a bad-conduct discharge might have been suspended had a different reviewer been utilized. However, the convening authority alone had discretion to grant that relief, and his judgment need not echo the conclusions of the interviewing officer. His duty is to independently evaluate all evidence weighing for or against leniency, the accused's worth to the service, and his probability of rehabilitation. To accomplish that, the fountainheads of information available to a convening authority should be controlled only by his good judgment. The post-trial clemency proceeding is intended simply to assist reviewing authorities in gathering relevant information to be used by them in making a determination of the advisability of extending clemency to one who, by his conviction, has been stripped of his rights to exact the highest protective privilege of a criminal code. Yet the Court insists on disqualifying available, and the best qualified, officers from post-trial participation because they might possibly have formed some opinion adverse to an accused. Cannot a prosecutor voice a recommendation for or against an accused? They do in almost every civilian court. Cannot a judge ask counsel for the Government to collect information touching on a defendant's past record, previous acts of misconduct, reputation, or anything else which will throw light on parole advisability? That is acceptable civilian practice. Why then should this Court seek so religiously to run away from accredited methods to protect one proven guilty? I know not; but, for myself, I take the generally recognized view that, after conviction and sentence, investigatory matters may be informal, and that those seeking clemency must affirmatively establish substantial prejudice before they are entitled to have their sentence set aside.

## IV

It appears to me as if the concurring Judge flounders around on the shifting sands of uncertainty to reach his conclusion. I quote from his opinion in United States v. Coulter, supra:

". . . a special court-martial convening authority is not 'limited in the sources from which he may obtain information [and advice] upon which to form an opinion as to the appropriateness of a particular sentence.' Neither, so far as I am informed, is an officer who exercises general court-martial jurisdiction. Either, I would say, is entirely free to consult, say, a member of his medical staff, the president of the court-martial which returned the findings of guilty, or 'a guy named Joe.' *Thus, I would in no way consider the trial counsel, himself, disqualified for this purpose.* However, when the latter does express his point of view, I believe that he should make it entirely clear that he is doing so *qua* trial counsel, with all of the possible partianship and zeal of advocacy not improperly inherent in that capacity— rather than as a staff judge advocate, safely cloaked in the sanctity of detachment imparted by the Code and Manual to that role." [Emphasis supplied.]

Now he says: "The importance attached to the post-trial interview signifies to me that—as in Coulter—we cannot permit its accomplishment by the very officer who prosecuted the accused, and who may suffer from a certain natural, understandable, and quite unconscious bias connected with that role." He

reconciles the two conflicting statements, but I do not.

Neither party has been afforded an opportunity to present arguments on the legal effect or applicability of the FTAF Regulation 111–3 used by the concurring Judge as one of the cornerstones for his conclusion. I, therefore, have grave doubts that it is properly before us. However, pretermitting that question, it merely prescribes a procedure to be used by that particular training command to expedite the processing of clemency reports. Its purpose can be considered as two-fold—it may assist the Government in conserving trained manpower, and it may aid the accused in obtaining leniency. However, it is revocable at any time by the headquarters which issued it, and certainly no vested right was conferred on the accused by its promulgation. We have previously held an accused has no vested interest in a particular policy or procedure adopted by one of the services, but more than that, in this instance, the directive was followed explicitly. The general instruction paragraph provides that the Wing Staff Judge Advocate or one of his assistants will conduct the post-trial clemency interview and submit the report. Here it was made by the Wing Staff Judge Advocate and he complied strictly with its requirements. In effect, the concurring Judge escapes that issue by his holding that the interviewing officer was disqualified because of having prosecuted the case. That is a disqualification created by him, not by the Code, the Air Force, or its regulations. As a matter of legal authority, and perhaps for policy reasons, a service could require a post-trial clemency report by the officer who tried the case and accused would have no just cause for complaint. Why, then, is it so offensive here? While I am more than willing to concede that all services desire to maintain high standards of fairness in clemency reports, I do not believe each deviation from those altruistic purposes should be seized upon by us as a reason for granting a further hearing in the matter. Furthermore, I believe that in a desire to enforce compliance with our views, we should not draw the noose too tighly as we may strangle the practice we seek to foster.