UNITED STATES, Appellant

v.

FRED HOOPER, Fireman Apprentice,
U. S. Navy, Appellee

5 USCMA 391, 18 CMR 15

No. 4834

Decided January 14, 1955

CDR Richard J. Selman, USN, for Appellant.

MAJ Charles J. McCaffrey, USMCR, for Appellee.

LT COL William R. Ward, U. S. Army, LT COL Thomas J. Newton, U. S. Army, 1ST LT Ezra B. Jones, Jr., U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Amicus Curiae.

LT COL Emanuel Lewis, USAF, LT COL Harold Anderson, USAF, and MAJ Stanley I. Harper, USAF, for Amicus Curiae.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A Navy board of review reversed the accused's conviction on the ground that the court-martial, convened by an Air Force officer, did not have jurisdiction over him. In accordance with Article 67(b)(2), Uniform Code of Military Justice, 50 USC § 654, The Judge Advocate General of the Navy asked this Court to review the legal correctness of the board's action. Additionally, The Judge Advocates General of the Army and Air Force separately moved for leave to appear as amicus curiae. These motions were granted.

The accused is in the United States Navy. He was granted leave from his ship, which was then in San Diego, California. At its expiration he did not return. After remaining away without authority for about a month, he was apprehended by civil authorities and delivered to the U. S. Naval Administrative Unit, Clarksville Base, Clarksville, Tennessee. He was provided with a railroad ticket and ordered to report back to his ship. In violation of these orders, he again absented himself without authority. In due course, a competent officer of the accused's organization entered in his service record a declaration that the accused was a deserter. Two and one-half months later, the accused was once more apprehended and turned over to the Naval Administrative Unit. In accordance with Article C–7807(5) of the Bureau of Naval Personnel Manual, he was retained by that unit for disciplinary action.

Three charges, including one of desertion, were filed and investigated by Navy personnel. The investigating officer recommended trial by general court-martial. Concurring in the recommendation, the commanding officer of the Naval unit forwarded the charges and report of investigation to the Commanding General, Field Command, Armed Force Special Weapons Project, Sandia Base, Albuquerque, New Mexico. Ultimately, this officer referred the charges for trial by a general court-martial convened by him.

The course followed by the Commanding Officer of the Administrative Unit was in compliance with a directive issued by the Commanding General of the Field Command. Under the directive, the Commanding Officer, Clarksville Base, a unit under the Field Command, was required to forward to the Commanding General for appropriate action all charges recommended for trial by general court-martial. The Base Commander passed on this order to the subordinate organizations of his command. The Naval Administrative Unit was one of these.

Authority for the convening of courts-martial by the Commanding General, Field Command, is derived from Department of Defense Directive No. 5510.1, dated July 20, 1953. It provides as follows:

"By virtue of the authority delegated to me by the President in Executive Order 10428 of January 17, 1953, and pursuant to the Uniform Code of Military Justice, Article 22(a)(7), I empower the Commanding Officer, Field Command, Armed Forces Special Weapons Project, to convene general courts-martial, and further, pursuant to the Uniform Code of Military Justice, Article 17(a), and the Manual for Courts-Martial, United States, 1951, paragraph 13, I empower such officer to refer for trial by courts-martial the cases of members of any of the armed forces assigned or attached to or on duty with such command. In accordance with

the Manual for Courts-Martial, United States, 1951, paragraph 5a(2) and appendix 4, this Directive will be cited in orders appointing courts-martial under this authority."

Executive Order 10428, cited in the above directive, delegates to the Secretary of Defense the President's authority to empower a commanding officer in any armed force to convene general courts-martial.

"By virtue of the authority vested in me by the Uniform Code of Military Justice, Article 140 (64 Stat 107, 145), and as Commander in Chief of the armed forces of the United States, I hereby delegate to the Secretary of Defense the authority, vested in the President by the Uniform Code of Military Justice, Article 22(a)(7), to empower any officer of the armed forces who is the commander of a joint command or joint task force to convene general courts-martial for the trial of members of any of the armed forces in accordance with the Uniform Code of Military Justice, Article 17(a), and the Manual for Courts-Martial, United States, 1951, paragraph 13."

Two limitations are urged as indicating a want of jurisdiction in the court-martial which tried the accused. The first is said to exist by reason of the terms of the President's Order. It is argued that this Order makes it mandatory for the convening authority to find affirmatively that it would result in manifest injury to the service if the accused is not tried by a court convened by him. See Manual, paragraph 13, page 17. The record apparently shows no such finding. The second limitation is allegedly imposed in the order of the Secretary of Defense. The limitation relates to the classes of military personnel subject to the jurisdiction of the Commanding General of the Field Command.

A court-martial is a special tribunal of limited jurisdiction. United States v. Goodson, 1 USCMA 298, 3 CMR 32. For its proceedings to be valid, it must affirmatively appear that it was legally constituted; and that it had power to

act with respect to the subject matter, and the person of the accused. United States v. Bancroft, 3 USCMA 3, 11 CMR 3. Validity may be put in issue on appeal, even though not urged at the trial level. Manual, paragraph 68b(1), page 99. United States v. Garcia, 5 USCMA 88, 89, 17 CMR 88. Here, no one disputes the general amenability of the accused to trial by court-martial for the offenses charged. The narrow question is whether he could be legally tried by the particular court to which the charges were referred.

Authorities who may convene a general court-martial are designated in Article 22(a), Uniform Code of Military Justice, 50 USC § 586. The commander of an organization such as that of the Field Command is not included in the specific enumeration. However, subdivision 7, extends general court-martial authority to "any other commanding officer in any of the armed forces when empowered by the President." It is, of course, not █ open to doubt that Congress may designate persons who may convene courts-martial, and that the President, as Commander in Chief of the armed forces under the Federal Constitution, may convene a court without such designation. Swaim v. United States, 165 US 553, 41 L ed 823, 17 S Ct 448. However, the court-martial was not convened directly by the President, but under the authority of Congressional delegation of power. Is this a valid delegation of legislative power?

Under the Federal Constitution, Congress has the power to "make Rules for the Government and Regulation of the land and naval forces." The Constitution, article I, section 8. It is well-settled that it cannot dele- █ gate its legislative power to an executive officer; but it may properly confer wide discretion as to the manner of execution of a statute it enacts. Arver v. United States (Selective Service Draft Law case), 245 US 366, 62 L ed 349, 38 S Ct 159. Patently, it is impossible for Congress to provide for every situation. In our present context, the military effort may require the formation of nu-

merous commands for special purposes. These may not, and frequently do not, fit into a fixed pattern of military units. Yet, in the circumstances of its operation, a new organization of this kind may require that the commanding officer have power to convene courts-martial. Consequently, if Congress provides a sufficient statutory standard, it may delegate administrative discretion to fill in the details. As was aptly noted by the United States Supreme Court in Yakus v. United States, 321 US 414, 88 L ed 834, 64 S Ct 660 (pages 425–426):

". . . Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers. Compare M'Culloch v. Maryland, 4 Wheat. (US) 316, 413, et seq., 4 L ed 579, 603. It is free to avoid the rigidity of such a system, which might well result in serious hardship, and to choose instead the flexibility attainable by the use of less restrictive standards. Cf. J. W. Hampton, Jr., & Co. v. United States, supra, (276 US 408, 409, 72 L ed 630, 48 S Ct 348). Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose of preventing inflation."

Congress has here provided a sufficient standard. The right to empower is not unrestricted. On the contrary, it can only be exercised with respect to persons having a well-defined position in military administration. The group may be large or small, depending upon the President's discretion, but the "Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality . . . to perform its function." Currin v. Wallace, 306 US 1, 15, 83 L ed 441, 59 S Ct 379. Hence, Article 22 (a) (7) is a valid exercise of Congressional power.

No direct empowerment by the President appears in this case. Instead, there is a grant of power from the Secretary of Defense, pursuant to the delegation of authority from the President set forth in Executive Order 10428, 18 FR 408. Thus, before proceeding to a consideration of the terms of these instruments, it is necessary to determine the right of the President to delegate the authority given to him by Article 22 (a) (7).

Article 140, Uniform Code of Military Justice, 50 USC § 736, gives the President authority to delegate all powers vested in him under the Uniform Code of Military Justice. It reads as follows:

"The President is authorized to delegate any authority vested in him under this code, and to provide for the subdelegation of any such authority."

From the language of the Article, it would seem that, regardless of the nature of the power, the President can delegate it. However, the hearings before the subcommittee, House Armed Services Committee, indicate that Congress may not have intended to make the right to delegate unlimited. Thus, in explaining the purpose of Article 140, Mr. R. W. Smart, Professional Staff Judge Member of the Subcommittee said,

". . . I think the general intent is that he [the President] would be authorized to delegate administrative authorities granted under the code but not judicial authority."

This statement of the intent of the Article was acknowledged by Mr. Felix Larkin, Assistant General Counsel, Office of the Secretary of Defense, one of the architects of the Code. After noting that the language had been recommended by the Bureau of the Budget, he too, thought that "despite this authorization the President cannot delegate judicial acts." Hearings, 81st Congress, 1st Session, on HR 2498, pages 1259, 1260. We need not, now, however, determine the full scope of Article 140.

Confining ourselves to the specific question, we are certain that the au-

thority to empower a commanding officer to convene a general ■ court-martial is delegable.

Undeniably, judgment is required in determining the advisability of investiture, but the nature of that judgment is not in any sense judicial. Cf. Runkle v. United States, 122 US 543, 80 L ed 1167, 7 S Ct 1141. Therefore, the authority to empower, granted by Article 22(a)(7) to the President, is legally delegable by him to the Secretary of Defense. See Dingman v. United States, 156 F2d 148 (CA9th Cir 1946), cert den 329 US 730, 91 L ed 631, 67 S Ct 86 rehearing den 329 US 831, 91 L ed 705, 67 S Ct 479. This conclusion brings us to a consideration of the extent of the power conferred upon the commanding officer who convened the court in this case.

Basic to a determination of our problem is Article 17(a), 50 USC § 577. That Article provides as follows:

"(a) Each armed force shall have court-martial jurisdiction over all persons subject to this code. The exercise of jurisdiction by one armed force over personnel of another armed force shall be in accordance with regulations prescribed by the President."

The Navy construes the Article as requiring, in a jurisdictional sense, an affirmative showing of strict compliance with the supplementary Presidential regulations. On the other hand, the Army and Air Force interpret the provisions as constituting an absolute grant of reciprocal jurisdiction, which cannot be affected by any policy regulation by the President regarding the details of its exercise. As appears from their respective opinions, my brothers accept generally the latter construction. I disagree because that construction ignores the legislative history of Article 17(a), and divests the supplementary Presidential regulations of all meaning. If Article 17(a) confers absolute reciprocal jurisdiction, the Manual's provision for specific empowerment of joint commanders to exercise such jurisdiction is meaningless.

Prior to the Uniform Code of Military Justice, each armed force could normally try only its own members. Certain narrowly defined exceptions existed; each was expressly provided for by statute. Article of War 2, 10 USC § 1473, 41 Stat 787; 34 USC § 1201; see also: Naval Courts and Boards, 1937, § 340, page 194. Unification of the military establishment and the growing tendency to undertake military operations by joint forces required a more flexible arrangement. Hence, some provision for reciprocal jurisdiction was considered desirable. Article 17(a) of the Code was designed to achieve this flexibility. House Hearings, supra, pages 602, 614.

In view of the history of reciprocal jurisdiction and the purpose of Article 17(a), it appears that Congress did not intend to abolish completely the right of an accused to be tried by a court convened by a commanding officer of his own service. The background material strongly indicates that Congress intended to retain that general limitation in the Uniform Code, subject, in the interest of military necessity, to such exceptions as the President might prescribe by regulation. Plainly, the Congressional subcommittee was intensely interested in precluding the criticism that might arise from authorizing reciprocal jurisdiction as a general rule. They closely examined the draftsmen as to the purpose of the article, in an obvious effort to have the record clearly show that reciprocal jurisdiction was to be circumscribed by Presidential regulations. The explanatory statements by the draftsmen emphasize that neither they, nor the Congressional subcommittee believed that Article 17(a), by itself, conferred unqualified reciprocal jurisdiction. The following discussions before the subcommittee make clear the fact that reciprocal jurisdiction requires more than a court convened by competent authority. In addition, there must be compliance with the supplementary regulations prescribed by the President.

"MR. RIVERS. I can conceive that maybe a Navy man would not want to be tried by the Air Force or vice versa.

"MR. LARKIN. It is our notion,

Mr. Chairman, that the services would continue to try their own people to the maximum extent.

"In observing the tendency in military operations over the last few years and those that we can probably expect in the future, we believe that the tendency is more to joint types of operation.

"MR. VINSON. That is right.

"MR. LARKIN. And on that basis we felt, even though we expect that each service will normally try its own personnel, that there be provisions so that each service could try the personnel of other services who happen to be serving in isolated areas with them, so that there would be an economy in the use of courts and there would be more expeditious trials.

"We could not forecast, however, all the different types of possible joint operations in the future. We felt, therefore, it would be more flexible to leave it to the regulations of the President so that when we came upon circumstances in which it was clearly practical to have the top commander, whether of Army, Navy, or Air Force, have jurisdiction over all of the personnel of the other services serving under him then the exercise of that jurisdiction by the Army, if you will, over Navy and Air Force in that circumstance would be conferred.

"*But we did not feel it practical to provide automatically in advance the jurisdiction to the top commander because we just cannot forecast the composition of the joint forces or joint operations which may take place.*

"I think this example might help. Take the invasion of Europe, in which General Eisenhower was the top commander. If we provide that the service of the commander of the joint operation have courts-martial jurisdiction and may not try any Air Force or Navy man in that whole operation, why it would have been a provision that was unnecessary because there were plenty of Navy personnel there, that is there were plenty of appropriate naval officers who could convene courts within that whole big operation. There is no reason why they should not, following the idea that each service will normally try its own personnel.

"Now, there may be other types of joint operations which we just cannot foresee at this minute in which it will be entirely appropriate for one service to exercise its jurisdiction over the other services and there will be others in which it is not necessary.

"*We felt, when they come up and when we can appraise them, at that time we can give the right to exercise this jurisdiction over the other services to the major service or the top commander present.*

"*But to give it on a blanket basis when in some instances it is not necessary may create interservice problems there that we just could not foresee.*

• : • • • •

"MR. RIVERS. We want to avoid any criticism by somebody who wants to make headlines, such as some newspaper set-up of whatever nature it may be who may be partial to one branch of the service using such a thing as that to bring about an unwarranted commentary or criticism. I know that is what you had in mind.

"MR. LARKIN. That is right. We felt that it may be necessary and appropriate and result in an efficient use of courts if the Army, the Navy or the Air Force under certain circumstance, do not try men of another service when they are operating with them.

"MR. RIVERS. Your classic example is the MATS.

"MR. LARKIN. That of course is a permanent operation at this time. *We expect if we are ever in a war again that there will be joint operations of various kinds which will dictate or indicate that it is sensible to have this reciprocal jurisdiction.* But we just cannot tell what there will be at this time.

"MR. RIVERS. That is the only appreciable dilution of one service, that is a mix-up of different services we have now in existence, is it not, to amount to anything, and that is the MATS?

MR. LARKIN. MATS is at this time I think the principle one. There is

one other circumstance I believe where there are some Army engineer officers who I think have been assigned on a relatively permanent basis to the Air Force.

"MR. RIVERS. I see.

"MR. LARKIN. Just how much that is going to grow as unification grows, is hard to tell at this time, but it was our idea to provide by statute for reciprocal jurisdiction and then as closer and closer operations come into being we provide that the President proscribe when this reciprocal jurisdiction should operate. But we need to have the authority in the first instance. If we do not have it, then it can never operate, you see.

"MR. RIVERS. I see.

"MR. BROOKS. This provides a workable set-up for a theory of carrying on war by task force?

"MR. LARKIN. That is right.

"MR. RIVERS. That is right.

"MR. LARKIN. *But it leaves it flexible so that we can appraise the character and nature of these different task forces as they are made up and depending on their nature at that time we can ask the President to provide reciprocal jurisdiction. If he does not do it, why then the exercise does not take place.*" [House Hearings, supra, pages 614, 957–958. Italics supplied.]

The conditional nature of reciprocal jurisdiction under Article 17(a) is clearly apparent in the discussions before the subcommittee. Congress was cited to only two instances of joint operation in which there was "a relatively permanent basis" of commingling of personnel of different armed services. The need was indicated as being entirely prospective in nature. Flexibility for the future was the objective. The means of attaining that flexibility was an authorization to the President to make appropriate regulations. As Mr. Larkin succintly put it, "if he does not do it, why then the exercise does not take place." House Hearings, supra, page 958. This construction would be incontrovertible had Congress inserted the words "provided however, that," in the place of the period between the two sentences in the article. However, the

hearings establish the qualified nature of reciprocal jurisdiction just as clearly as if it were actually spelled out.

Numerous reasons for the desirability of a limited reciprocal jurisdiction are readily apparent. These are as persuasive as the reasons advanced to support the claim of absolute jurisdiction. I need not, however, balance one against the other. Congress has plenary power to define the jurisdiction of a court-martial. Neither judicial nor administrative preference can infringe upon the exercise of that power. United States v. Darby, 312 US 100, 85 L ed 609, 61 S Ct 451. Congress has declared its intention to qualify reciprocal jurisdiction. This Court must give effect to that intention.

Reciprocal jurisdiction, therefore, may be exercised only when there is compliance with regulations prescribed by the President. The power to make such regulations in no way constitutes an improper delegation of legislative power. No enlargement of the classes of persons subject to court-martial jurisdiction is provided for. Congress, itself, has provided that all members of the armed forces are subject to trial by court-martial. It has manifested its intention that each armed force only exercise jurisdiction over its own personnel, except when military need, as determined in regulations promulgated by the President, requires the exercise of reciprocal jurisdiction. The determination of what occasion requires reciprocal jurisdiction may properly be delegated to the President. See United States v. Curtiss-Wright Export Corp., 299 US 304, 81 L ed 255, 57 S Ct 216.

Regulations governing the exercise of reciprocal jurisdiction have been prescribed by the President. The Manual for Courts-Martial sets them out in a number of separate paragraphs. For convenience we may start with paragraph 14 which defines the jurisdiction of a general court-martial in the following terms:

"*a. Persons and offenses.*—Subject to the regulations prescribed in 13, general courts-martial have power to try any person subject to the code

for any offense made punishable by the code."

In material part, paragraph 13 provides:

"In general, jurisdiction by one armed force over personnel of another should be exercised only when the accused cannot be delivered to the armed force of which he is a member without manifest injury to the service. Subject to this policy, the commander of a joint command or joint task force who has authority to convene general courts-martial may convene courts-martial for the trial of members of another armed force when specifically empowered by the President or the Secretary of Defense to refer such cases for trial by courts-martial. Such a commander may, in his sound discretion, specifically authorize commanding officers of subordinate joint commands or joint task forces who are authorized to convene special and summary courts-martial to convene such courts for the trial of members of other armed forces under such regulations as the superior commander may prescribe.

"Cases involving two or more accused who are members of different armed forces should not be referred to a court-martial for a joint or a common trial.

"As to the composition of a general or special court-martial for the trial of an accused who is a member of another armed force, see 4g."

The pattern is completed by the provisions of paragraph 4g.

"g. *Appointment of members and law officers from other armed forces.* —(1) *General policy.*—Members of courts-martial should be members of the same armed forces as the accused. There is no policy restriction on the appointment of law officers from among qualified officers under the command of the convening authority irrespective of the armed force of which such law officers are members. Whenever it is necessary to convene a court composed of members of more than one armed force, at least a majority of the membership of a general or special court-martial sitting for the trial of a case should be members of the same armed force as the accused unless exigent circumstances render it impracticable to obtain such members without manifest injury to the service.

"(2) *Appointment of members and law officers from within a joint command or joint task force.*—The commanding officer of a joint command or joint task force who has been specifically empowered by the President or the Secretary of Defense to exercise jurisdiction over personnel of another armed force (13) may, in accordance with the policy stated in 4g(1) above, appoint as members of courts-martial or as the law officer of a general court-martial, eligible persons under his command who are members of the same armed force as the accused. When, to avoid manifest injury to the service, it is necessary to appoint members of any other armed forces to serve on such a court-martial, such appointments may be made as an exception to the policy announced in 4g(1). The commanding officer of a subordinate joint command or joint task force who has been authorized by the superior commander to exercise reciprocal special and summary court-martial jurisdiction (13) may, subject to similar restrictions, appoint as members of such courts-martial any eligible persons of his command. The superior commander may also make available to such subordinate convening authority other persons who are members of the accused's armed force in order that the court may be constituted in accordance with the policy announced in 4g(1)."

Careful reading of these provisions discloses a curious absence of words of command. The primary word is "should," a word usually understood as indicating action desired, but not required. See United States v. Voorhees, 4 USCMA 509, 527, 16 CMR 83. That guidance, not command, may be the intention of the regulation is further suggested by the phrase, "subject to this policy" appearing in paragraph 13, and the like phrase set out in paragraph

4g. A policy declaration does not necessarily impose a legal restriction on the exercise of a right vested under the Uniform Code. See: United States v. Doherty, 5 USCMA 287, 17 CMR 287. Thus considered, the regulation may be subject to attack as an attempt to circumvent Article 17(a) because it authorizes an unfettered exercise of reciprocal jurisdiction. Cf. St. Louis Independent Packing Co. v. Houston, 215 F 553 (CA 8th Cir 1914). However, I need not pause over the possibility of this conflict. For the present purposes, I may assume that the Presidential regulations are mandatory in intent.

First among the enumerated requirements for reciprocal jurisdiction is that it be exercised "only when the accused cannot be delivered to the armed force of which he is a member without manifest injury to the service." Manual, supra, paragraph 13, page 17. The board of review concluded that the record contained no "indication whatever" of any manifest injury. This conclusion is said to be erroneous. It is asserted that in the absence of contrary evidence, it must be presumed that, before he referred the case for trial, the convening authority made the necessary determination of manifest injury. See Swaim v. United States, supra. As I construe paragraph 13, it is unnecessary to decide the question.

After stating the requirement of manifest injury, the Manual provides that:

". . . Subject to this policy, the commander of a joint command or joint task force who has authority to convene general courts-martial may convene courts-martial for the trial of members of another armed force when specifically empowered by the President or the Secretary of Defense to refer such cases for trial by courts-martial." [Paragraph 13.]

The significance of this sentence becomes apparent on analysis. Although introduced by the clause "subject to this policy," what follows is not dependent on the manifest injury provision of the preceding sentence. Thus, the commander of a joint command is referred to as one "who has authority to convene general courts-martial" "when" certain action is taken by the President or the Secretary of Defense. A clear differentiation is recognized between the power of a joint commander to convene a court and the power to refer a case in which the accused is a member of a different armed force. The power to convene may exist independently of authorization from the President. See: Article 22(a), Uniform Code of Military Justice. But, even though the convening authority is a joint commander, he cannot exercise reciprocal jurisdiction without reference to the manifest injury regulation. However, "when specifically empowered" by the President or the Secretary of Defense, he may refer a reciprocal case to a court convened by himself, without any preliminary decision as to manifest injury. In other words, specific authority from the President or Secretary of Defense to exercise reciprocal jurisdiction is an exception to the general requirement of manifest injury. The exception is emphasized by the succeeding sentence which confers upon an empowered joint commander the right to prescribe, "in his sound discretion," regulations to be followed by subordinate commanders in referring to special and summary courts cases of personnel of other armed forces.

To interpret paragraph 13 as meaning only that a joint commander may be empowered by the President or Secretary of Defense to convene courts-martial, and to try other members of the armed forces on the same basis and subject to the same limitations as every other convening authority, results in extreme redundance. Since the manifest injury requirement is set out in one sentence, it would be entirely unnecessary to reiterate it in the next sentence. More important, though, is the fact that, under the Code, the Secretary of Defense is not authorized to convene a court or empower any other officer to convene a court. If he is to have that authority, it must be given to him by delegation from the President. See Articles 22(a), 140.

It may be argued that the Manual provision constitutes a delegation of the President's authority. The contention loses its force in view of Executive

400

Order 10428. That order expressly delegates the President's Article 22(a) (7) authority with respect to joint commanders. The Manual took effect by virtue of Executive Order 10214, dated February 8, 1951. Executive Order 10428 is dated January 17, 1953, almost two years later. If it was thought that the Manual constituted a delegation of authority, the later order would be entirely useless. Inutility is not readily to be imported to the President's action. Inasmuch as the Manual can reasonably be interpreted to effectuate it and the subsequent executive order, the harmonious construction should prevail.

As I have construed paragraph 13, it is fully in harmony with the Congressional purpose in authorizing reciprocal jurisdiction. It was stressed by the draftsmen that Article 17(a) contemplated reciprocal jurisdiction in joint operations in accordance with regulations by the President. Mr. Larkin, however, expressly pointed out that not every joint operation required that the commanding officer have the power to try personnel of other armed forces. He clearly emphasized the limitation in his reference to the invasion of Europe under the direction of General Eisenhower (House Hearings, supra, page 614). The Manual effectuates the Congressional purpose by providing that reciprocal jurisdiction will not be exercised, unless manifest injury to the service would result by returning the accused to his own armed force. In the case of a joint operation, however, the President or Secretary of Defense, his chief executive officer in the military field, may empower the joint commander to exercise jurisdiction, without regard to the requirement of manifest injury. Quite obviously, the President or Secretary of Defense is best able to determine whether the exigencies of the joint operation require the commander to have general power to try military personnel, regardless of the armed force to which they belong.

Turning to the facts of this case, it is undeniable that the Commanding Officer, Field Command, was properly authorized to convene courts-martial. Equally undeniable is his specific power to refer to a court-martial convened by himself, cases in which the accused is a member of a different armed force. Up to this point then, we have strict conformity with the Uniform Code and the President's regulations. The remaining question is whether the commander's empowerment is limited to designated classes of persons, including one to which this accused belongs. The board of review below held that the grant was restricted, and that it did not extend to personnel who "might fall into his [the commander's] grasp by chance as did this accused."

At the outset, I note that the Manual regulation does not contain any restriction on the classes of military persons that may be tried by a court convened by a commander of a joint command who has been specifically empowered to exercise reciprocal jurisdiction. Thus, if any limitation exists, it must be found in the order of empowerment. I may assume, without deciding, that appropriate limitations may be written into the grant of power.

The Department of Defense directive in issue provides for reference for trial of cases of "members of any of the armed forces assigned or attached to or on duty with such command." On its face, therefore, the power to exercise reciprocal jurisdiction does not extend to a case in which the accused is a member of an armed force different from that of the convening authority and is not "assigned or attached to or on duty with" some unit in the joint command. It follows that the board of review was correct in holding that power to refer reciprocal cases for trial was not unbounded. However, the board of review erred in its ultimate conclusion that the accused was a vagrant person having no nexus with the joint command.

It affirmatively appears that during his second absence, the accused was duly declared a deserter. This declaration was noted in his service record by the executive officer of the ship to which he had been regularly assigned. It may be assumed that the accused's records were then forwarded to the Chief of Naval Personnel. See: Bureau of Naval Personnel Manual, Article C–7806. When the accused was again

apprehended and returned to the Naval Administrative Unit, that organization made an entry regarding his status. This entry dated September 1, 1953, shows that the accused was retained by the unit "for disciplinary action in accordance with Art. C–7807(5), BuPers Manual." The cited provision of the Bureau of Personnel Manual reads as follows:

"The Chief of Naval Personnel desires that disciplinary action .be taken by the command to which a deserter surrenders or is delivered. However, in order to facilitate administrative procedures, commandants of naval districts are authorized to transfer returned deserters to any receiving station or naval station within their own naval district for appropriate disciplinary action."

It is evident from the record that after the accused's apprehension and return to Naval control, his service records were obtained and carried by the Administrative Unit. See Bureau of Naval Personnel Instruction 1626.10, paragraph 4b, dated July 23, 1953. Under Navy procedure, an unauthorized absentee is regarded as attached to the organization which carries his records. This is expressly stated in Article C–7802(5), Bureau of Naval Personnel Manual:

"In connection with the following article and in order that there may be a standard procedure prescribed, the Chief of Naval Personnel considers that, as a general rule, an individual is attached to that ship or station which carries his records. The following cases, however are exceptions:

"(a) A person who absents himself or deserts while en route to the next naval activity to which ordered to report is considered attached to the activity to which ordered to report, even though such activity may be an intermediate reporting activity. (See Art. C-7814 concerning transfer of prisoners.) (Change No. 10.)

"(b) A person who absents himself or deserts while on board a naval vessel for transportation between stations is considered attached to the transporting vessel.

"(c) Enlisted personnel of the Regular Navy attached to a vessel assigned to a naval district for training Reserves, and to which a commanding officer is not assigned, are under the administrative and military command of the commandant of the naval district."

The charge sheet and each specification of the three separate charges filed against the accused describe him as a member of the Naval Administrative Unit. Therefore, entirely apart from the effect of his unqualified plea of guilty to two of the specifications (Cf. United States v. Garcia, supra), the accused was clearly attached to the Administrative Unit at all times important to the issue here. As an attached person, he was plainly within a class of persons subjected to the Field Command's court-martial jurisdiction by the express terms of the empowerment by the Secretary of Defense.

Left for consideration is whether there is compliance with the other Presidential regulations regarding the exercise of reciprocal jurisdiction. These additional provisions are set out in paragraph 4g of the Manual. Again, I need not decide whether the language of that paragraph is mandatory or permissive. Neither need I consider whether the requirements apply with the same force to a commander "specifically empowered" to try accused who are members of other armed forces. Suffice it for our purposes, that in this case there is strict adherence to the regulations. All members of the court were members of the same armed force as the accused. Moreover, although not required, defense counsel was also a member of the same armed force. See Manual, supra, paragraph 6a, page 10. We find, therefore, complete observance of, and compliance with, the provisions of the Uniform Code and the President's regulations.

For the reasons set out in our separate opinions, we answer in the affirmative the certified question as to whether the court-martial "possessed

jurisdiction to try and determine this case."

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Navy for action consistent with this opinion.

BROSMAN, Judge (concurring in the result):

I concur fully in the result reached by the Chief Judge. However, I much prefer to base our determination on other grounds.

## II

In light of the unqualified initial sentence of the Code's Article 17(a), 50 USC § 577, I suspect that ■ Congress intended that a duly appointed court-martial of one Armed Force should always possess *jurisdiction* over the personnel of another—whatever exactly "jurisdiction" may mean. This view seems to enjoy the support of the spirit and objects of the Uniform Code—which legislation I conceive to constitute as much a phase of unification as it is an example of law reform. In short, I doubt that the question before us is one which could successfully be raised in a Federal civilian court on habeas corpus. Further, I see no reason why we should permit it to be raised for the first time on review within the military judicial hierarchy, even though—as pointed out in United States v. Garcia, cited in the principal opinion—jurisdiction may not be the subject of waiver.

## III

Although we assume that "the regulations prescribed by the President"—see Article 17(a)—are part of the definition of reciprocal jurisdiction, I find no worrisome problem. These Presidential regulations are found in paragraph 13 of the Manual—and recite that "*In general*, jurisdiction . . . *should* be exercised only when the accused cannot be delivered to the armed force of which he is a member without manifest injury to the service." (Italics supplied.) ▲ The italicized words do not seem to me to contain any suggestion of command—but rather imply no more

than a policy directive. Cf. Sullivan v. United States, 23 Law Week 4019. The following sentence—it is to be observed—begins, "Subject to this *policy*," a phrase also indicative of general guidance rather than a purpose to supply a hard-and-fast rule. (Italics supplied.) Why may not the President in his regulations permissibly leave flexible the decision as to cases in which a serviceman may be tried by the courts of an Armed Force other than his own? Indeed, I can recognize no sort of intendment in Article 17(a) that the President may not appropriately make the utilization of reciprocal trials a matter of policy rather than one of jurisdiction.

## IV

I am also not at all sure that the presence or absence of "manifest injury to the service" may properly be considered by this Court. Clearly—at least on collateral attack in civilian courts—there has been a noticeable reluctance to hold that determinations under conceptions similar to the one with which we are concerned are reviewable. See Swaim v. United States, 165 US 553, 41 L ed 823, 17 S Ct 448. Assuming, therefore, that the criterion of "manifest injury" constitutes a limitation within the present context, I would hesitate to hold that General Stranathan had, as a matter of law, overreached his discretion in referring the accused's case for trial—and certainly so if the alleged abuse had not been raised at the court-martial hearing.

LATIMER, Judge (concurring in the result):

I concur in the result.

## I

Generally speaking Judge Brosman expresses my views, but I prefer to develop further two concepts ■ suggested by him because I interpret the provisions of paragraph 13 of the Manual for Courts-Martial, United States, 1951, exactly opposite to the construction advanced by the Chief Judge. If we give meaning and content to all of the language set out therein, the policy declaration applies to all services and all

**403**

commanders, including those who are detailed as commanding officers of a joint task force or a joint command. It hardly makes sense to me to except the latter commanders from its coverage when, so far as I can determine, they are the officials most apt to have all service court-martial systems available for trial of cases; and, they are the only ones mentioned in the Manual as having an assignment which will permit the President or the Secretary of Defense to empower them with authority to cross service lines for the prosecution of all service personnel. Either at the time the Manual was promulgated the declared policy applied to them or it applied to no one. In the latter event, its inclusion in the Manual was a futile and unnecessary act, a principle of construction which is not looked upon with favor. Under my interpretation, I would not offend against that canon as the policy declared by the President would apply to all convening authorities. But even if my construction was adopted by the Court, reversal would not follow as a matter of course.

Article 17(a) of the Uniform Code of Military Justice, 50 USC § 577, provides:

"(a) Each armed force shall have court-martial jurisdiction over all persons subject to this code. The exercise of jurisdiction by one armed force over personnel of another armed force shall be in accordance with regulations prescribed by the President."

To avoid the use of confusing terms, I shall arbitrarily substitute the words "power to proceed" for the phrase "exercise of jurisdiction." When the two sentences of the Article are interpreted in the light of that substitution they state, in substance, that while each armed force has court-martial jurisdiction over all persons subject to the Code, the power of one service to proceed in its court-martial system against a member of another service does not come into existence until the President implements the Code with regulations governing the procedure.

Now as to the intent of Congress when it used the phrase "court-martial jurisdiction" in the first sentence, I

would suggest it intended to state that the court-martial system of one service, up to and including review by the convening authority, was a proper vehicle by which a member of another service could be charged with, tried for, and convicted of, an offense against military law. Of course, the vehicle could not be used unless and until it was appropriately assembled by the President having promulgated regulations. In the event of assembling regulations, and if there were no Executive limitations, all courts-martial of the services would have authority to proceed against any member of any armed service. Here then, our proposition seems to be to determine whether the President expressly conditioned the power to proceed upon a finding of manifest injury to the service or whether the policy declaration was merely an admonition which might influence, but did not bar, the right to prosecute. Stated somewhat differently, in the form of a question, to what extent does the manifest injury to the service declaration of policy found in the Manual block the flow of interservice prosecutions which have been authorized?

If the services are to develop a practical approach to an orderly military judicial system, they must give consideration to the President's expressed declaration in paragraph 13 of the Manual and not cross service lines to prosecute each and every case without rhyme or reason. But that does not mean that commanders of task forces or joint commands have no discretion whatsoever to deal with personnel of their command; nor that every case must be tried by the service to which the accused belongs unless the prosecution affirmatively establishes that to do so would manifestly injure the military service. To narrow the power of a commander by that rule would disregard the plain meaning of some of the language used in the Manual and would unnecessarily restrict the policy as it was declared by the President. Moreover, it would convert a permissive provision into one of inflexible compulsion and deny a commander any liberty of action. By the language used the framers of the Manual must have intended to

convey the thought that as a general proposition, or one to be applied in a majority of cases, a commander of a joint task force or joint command ought not to interfere with a service in processing its own offenders. But, if in any given instance, he concluded to exercise his authority and ordered the case to be tried by a court-martial of a service different from the one to which the accused belonged he would not abuse his discretion.

Each word of a regulation must be given some force and effect and, at best, the declaration that prosecution by one armed force over personnel of another shall not be initiated if the accused can be delivered to his own service without manifest injury is prefaced by a statement that it is general in scope and purpose. It is, as Judge Brosman has stated in his concurrence, couched in language which is not a positive command but merely a phrase of general guidance. As such it is not a condition precedent to prosecution but is merely a cautionary instruction for the guidance of the commanders. An accused has no inalienable right in a policy declaration and certainly no legal right to complain at a commander's failure to follow admonitory directions. Assuming, without deciding, that the latter failed to comply literally with the policy, if that is an error, it cannot inure to the benefit of one brought to trial.

## II

The second concept which bears some elaboration involves the right of the accused to first raise this issue on appeal. If the policy declaration of manifest injury constituted a limitation on the right to prosecute, it would mean, at most, that the court-martial could not use its latent power to subject the accused to a finding and sentence. In other words, it could not proceed against him because of the possibility that policy considerations might render him immune to prosecution. But an accused, by his acts, may waive immunity extended to him. Certainly, in a general way we are dealing with a right or privilege personal to an accused. As a general proposition of law, a person can waive that sort of preferment and in this instance I would hold the accused had done so. By failing to object at the time of trial, he neglected to make an issue at a time when if any showing were necessary it could have been made. It must be conceded that if certain facts existed, the convening authority could, in any event, order the accused tried by the court-martial which heard his case. Whether those facts were presented to the convening authority, we do not know; and he has not been afforded an opportunity to advance any reason which might have prompted him to refer this case to a court-martial convened by him rather than to release the accused to the Naval Service for disciplinary action. Absent any showing to the contrary, he is presumed to have acted within, and not without, the regulation. Had the accused raised the issue at the time of trial any facts material to the question could have been presented, weighed, and evaluated. So far as I am concerned, the burden to raise and prove a violation of a policy declaration is on the accused and it must be litigated before the trial court. While lack of jurisdiction, as generally understood, may be raised at any time, this case does not fall within the scope of that principle. At best, we have only a policy hurdle which cannot be seized upon for the first time on appeal.