**UNITED STATES**

v.

**Gregory P. DeBARROWS, Machinery Technician First Class U.S. Coast Guard.**

CGCMS 24045.
Misc. Docket No. 001–94.
Docket No. 1044.

U.S. Coast Guard Court of Criminal Appeals.

17 Jan. 1995.

false statements (two specifications) and theft of government funds in violation of Articles 107 and 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907 and 921, respectively. Appellant was sentenced to reduction to pay grade E–4, confinement for 30 days and to be fined $4500. Pursuant to a pretrial agreement, the convening authority approved the sentence and ordered it executed, except that the fine was commuted to forfeitures of $608 per month for six months. The pretrial agreement contained a provision that: "The convening authority agrees not to initiate administrative separation based solely on the facts underlying these charges." The Appellant served his sentence and remains on active duty.

In December of 1993, twenty-one months after the trial, the Commandant of the Coast Guard directed a special Reduction in Force (RIF) program to reduce the number of Coast Guard military personnel to a level consistent with the Service's fiscal year 1994 budget. The Appellant met one of the criteria for separation under the program, in that he had been convicted by a special court-martial within the 24 months immediately preceding announcement of the RIF. On January 13, 1994, the Coast Guard's Military Personnel Command (CGMPC) directed that the Appellant be discharged from the Service with an honorable discharge for convenience of the government.

On January 19, 1994, Appellant submitted an application for relief under Article 69(b), UCMJ, 10 U.S.C. § 869(b), via prescribed channels, to the Chief Counsel of the Coast Guard. In that application Appellant asserts that the discharge based on his special court-martial conviction would violate the terms of his pretrial agreement. On February 23, 1994, before receipt of the Article 69 application by the Chief Counsel, Appellant filed a petition for a writ of mandamus with this Court, citing the need for extraordinary relief from this forum in light of his imminent discharge, ordered for March 15, 1994. On March 1, 1994, the CGMPC directed that Appellant's discharge be held in abeyance pending action by this Court. Upon receipt

---

Trial Counsel: LCDR Allen Lotz, USCG.

Detailed Defense Counsel: LT Michael E. Tousley, USCGR.

Appellate Defense Counsel: CDR Wayne C. Raabe, USCG.

Appellate Government Counsel: LT John F. Koeppen, USCG.

Before BAUM, BRIDGMAN, FEARNOW, O'HARA, and WIESE,[1] Appellate Military Judges, En Banc.

FEARNOW, Judge:

On April 7, 1992, a military judge sitting alone as a special court-martial (bad-conduct discharge not authorized) found Appellant guilty, consistent with his pleas, of signing

---

1. Chief Judge Baum recused himself in this case.

of Appellant's Article 69(b) application, the Chief Counsel, pursuant to Article 69(d), referred it to this Court, along with the summarized record of trial[2], for review in conjunction with the mandamus petition. In addition to the question raised by Appellant concerning the effect of the pretrial agreement, we directed that the question of the competency of the convening authority in light of *U.S. v. Almy*, 37 M.J. 465 (C.M.A. 1993), be addressed by the parties.

## Standard of Review

■ Under the terms of Article 69(e), this Court may only act with respect to matters of law. This standard of review is discussed in *U.S. v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985):

> When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are "fairly supported by the record." *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983), quoting 28 U.S.C. § 2254(d)(8). "[T]o give due deference to the trial bench," a determination of fact "should not be disturbed unless it is unsupported by the evidence of record or was clearly erroneous." *United States v. Middleton*, 10 M.J. 123, 133 (C.M.A.1981).

■ With a petition for extraordinary relief, the petitioner must show a clear and indisputable right to the relief requested. *Smithee v. Vorbach*, 25 M.J. 561 (C.G.C.M.R. 1987). Moreover, the petitioner must have exhausted all other adequate remedies before resorting to extraordinary relief. *Coffey v. Commanding Officer, USS Charleston*, 33 M.J. 938 (N.M.C.M.R.1991).

Appellant's application under Article 69, as well as the petition for mandamus, as submitted by him, are both restricted to the single issue of whether the RIF-based discharge violates the pretrial agreement. Therefore, if this issue, as well as the one we have raised on our own, is resolved contrary to the appellant's contentions in the Article 69 application, it seems to follow that it is not possible for the petitioner to show the "clear and indisputable right to relief" required to grant mandamus relief. If the Article 69 application is resolved in the Appellant's favor, then the mandamus petition is moot. In either case, resolution of the Article 69 application will also resolve the mandamus petition.

## Convening Authority

■ This special court-martial was convened by Commander (CDR) G.E. Shapley, USCGR, "Commanding Officer, Coast Guard District Eleven Reserve Stationkeepers" (CO Stationkeepers). The trial judge *sua sponte* inquired into whether CDR Shapley was a proper convening authority. Following the introduction of a stipulation of fact, the testimony of Chief Boatswain's Mate (BMC) Collins who served under the command of CDR Shapley, the Secretary of Transportation's letter of May 1, 1987, designating Coast Guard court-martial convening authorities, and extracts from several Coast Guard manuals, the judge made the following findings of fact:

> * * * Coast Guard Reserve Center Yerba Buena Island has been assigned an Operating Facilities Number by COMDTINST M5440.2J of 2 April 1991 and is recognized as an Eleventh Coast Guard District unit by Annex A of the D11 SOP–1(FY);

> Coast Guard Reserve Center Yerba Buena Island is a sub-unit of the Eleventh Coast Guard District ...;

> Coast Guard Reserve Center Yerba Buena Island is under the direct command of Commander G.E. Shapley, USCGR;

> Commander Shapley is a reserve member of the U.S. Coast Guard on extended active duty;

> Commander Shapley ... is assigned as Chief, Eleventh Coast Guard District Reserve Program[s] Branch;

> Commander Shapley serves as Commanding Officer, Coast Guard District Eleven Stationkeepers and as such is the Commanding Officer of Coast Guard Reserve Center Yerba Buena Island;

---

**2.** The record was summarized per Rule for Courts–Martial (R.C.M.) 1103 since this special court-martial did not involve a bad-conduct discharge.

Commander Shapley performs administrative duties with regard to personnel matters and procurement;

Coast Guard Reserve Center Yerba Buena Island is a Coast Guard unit with an Operating Facilities Number, personnel assigned and appropriated funds available;

Coast Guard Reserve Center Yerba Buena Island has a prescribed mission to maintain and assist reserve units in their drilling obligations;

Commander Shapley has convened the court by his authority as the Commanding Officer, Coast Guard District Eleven Stationkeepers;

Commander Shapley was authorized to wear the Command Ashore Insignia. . . .

Based on his findings, the military judge ruled that Commander Shapley was a proper convening authority.

We believe the military judge's findings are "fairly supported by the record." *U.S. v. Burris,* supra. The stipulation, testimony and documents presented at trial indicated that CDR Shapley was designated by standard Coast Guard procedures as Commanding Officer of Reserve Stationkeepers in the Eleventh Coast Guard District. In that capacity he had under his command the facilities and military personnel assigned to Coast Guard Reserve Center Yerba Buena Island (YBI), San Francisco. Coast Guard Reserve Center YBI was established by order of a Coast Guard Operating Facility Change Order (OFCO) issued in December 1987. It is listed in the Coast Guard Organization Manual as a Coast Guard unit with an assigned Operating Facility (OPFAC) number. It has personnel assigned to it, and appropriated funds are available for its operation. The Center's mission is to support Coast Guard Reserve units that use it in meeting their drill requirements. Although he was located in Long Beach, California, and thus physically separated from Reserve Center YBI in San Francisco, CDR Shapley nevertheless performed administrative and procurement duties related to the command. He issued temporary assignments for personnel at-

tached to the Center, approved their leave and liberty requests, and assigned their enlisted evaluation marks. These factors more than adequately support the military judge's factual findings that CDR Shapley was in fact, and not only in title, a commanding officer of a Coast Guard unit, *viz.,* Reserve Center Yerba Buena Island. Thus his designation as "Commanding Officer, Coast Guard District Eleven Reserve Stationkeepers" includes his assignment as Commanding Officer of Reserve Center YBI.

■ Affirming the military judge's factual findings that CDR Shapley was commanding officer of an operating Coast Guard unit does not end the inquiry into whether he was competent to convene a special court-martial. What remains is to determine whether *this* commanding officer of *this* Coast Guard command had been properly designated as a convening authority under Article 23(a), UCMJ, because such authority is not an inherent attribute of every commander in the Armed Forces. While the military judge impliedly found that CDR Shapley was properly designated as a convening authority, there is no specific finding to that effect. The absence of such a finding is not important, however, as we consider this question to be one of law and not fact. Thus, we are not restricted to a determination of whether the military judge's findings were supported by the evidence of record.

■ Article 23(a), UCMJ, 10 U.S.C. § 823(a), provides in pertinent part:

Special courts-martial may be convened by—* * *

(5) the commanding officer of any naval or Coast Guard vessel, shipyard, base, or station; . . .;

(6) . . .;

(7) the commanding officer or officer in charge of any other command when empowered by the Secretary concerned.

While we believe CO Stationkeepers's (Reserve Center YBI) authority to convene this court is sustainable under Article 23(a)(5) [3],

---

**3.** Article 23(a)(5)'s terms, "vessel, shipyard, base, or station," are not defined further in the statute. See 10 U.S.C. §§ 101 & 801. Under the circum-

stances, the court gives ordinary meaning to the terms used. However, that does not mean that we are required to use a rigid or formalistic

the lack of clear precedent interpreting designations under that provision causes us to focus our attention on Secretarial designations under Article 23(a)(7). Pursuant to that provision, the Secretary's letter of May 1, 1987 designated as special court-martial convening authorities (SpCM CAs) "Commanding Officers of all Coast Guard units, some of whom have specific statutory authority." Since CO Stationkeepers (Reserve Center YBI) is a commanding officer of a Coast Guard unit, it falls within the Secretarial designation as a SpCM CA. However, the defense argues that in this case this Secretarial designation is an improper delegation under *U.S. v. Greenwell,* 19 U.S.C.M.A. 460, 42 C.M.R. 62 (1970), and its progeny[4]. The defense asserts that the authority to create SpCM CAs is nondelegable and that the Secretary's letter purporting to designate all Coast Guard unit commanding officers as SpCM CAs was a *de facto* abdication of designation authority to the Commandant and his immediate staff. In *U.S. v. Almy,* 34 M.J. 1082 (C.G.C.M.R.1992), we were required to analyze a unit designated as the Coast Guard Pacific Area Tactical Law Enforcement Team (TACLET), and in responding to a challenge to the authority of the Commanding Officer of that unit to convene a SpCM, we stated:

Establishment of Coast Guard units with commanding officers is properly accomplished by the Commandant of the Coast Guard. Units so constituted by the Commandant are separate, self-sufficient organizations designed to carry out one or more of the varied Coast Guard missions. They are not paper organizations created simply to accommodate administrative and disciplinary needs, as appeared to be the case in *U.S. v. Greenwell,* supra, and *U.S. v. Cunningham,* supra. In our view, the holdings in *U.S. v. Greenwell,* supra, and *U.S. v. Cunningham,* supra, are inapplicable here.

34 M.J. 1082, 1084. We believe this view applies equally well to the instant case. We adopt it in rejecting the claim that when the Commandant of the Coast Guard, acting through his Chief of Staff, establishes a new Coast Guard unit, he has unlawfully usurped authority to designate SpCM CAs that is vested in the Secretary. The Commandant is not designating an SpCM CA, rather he is only establishing a Coast Guard unit that is within the scope of the Secretarial designation and which derives its ability to convene courts-martial from the Secretary.

In reviewing this Court's decision in *Almy,* the Court of Military Appeals did not rely on the above rationale, but instead noted that the TACLET was a unit that had been estab-

---

approach. See *Givens v. Zerbst,* 255 U.S. 11, 41 S.Ct. 227, 65 L.Ed. 475 (1920) (rejecting out of hand a defense argument to narrowly construe Presidential designation authority under the Articles of War). The fact that the Coast Guard did not use "shipyard, base, or station" in the unit name when it created or changed a shore unit is not controlling. It would be putting form over substance if we held that Congress intended only certain specific names to be used for shore units in order for the command to have CA authority. Rather, like "vessel" which encompasses any ship, cutter, or boat within the Navy and Coast Guard (see 1 U.S.C. § 3), "shipyard, base, or station" should be construed as generic terms. In the Coast Guard, "station" is traditionally used to refer to smaller shore units. See *Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the House Comm. on Armed Services,* 81st Cong., 1st Sess. 953–54 & 1138 (1949); S.Rep. No. 486, 81st Cong., 1st Sess. 14 (1949). Even BMC Collins in his testimony referred to his Reserve Center as "Station YBI." Moreover, the members who actually oversee the Reserve Centers are called *"Stationkeepers."*

CO Stationkeepers is an umbrella command over the three Reserve Centers which are small shore units which are considered stations. The fact that the command consisted of a group of stations, instead of one, does not undermine CO Stationkeepers from being a commanding officer of a station under the statute.

4. *U.S. v. Cunningham,* 21 U.S.C.M.A. 144, 44 C.M.R. 198 (1971) (the *Greenwell* Secretarial delegation was also found wanting with respect to the Commanding Officer, Enlisted Personnel, Headquarters Eighth Naval District); see also per curiam decisions in *U.S. v. Walker,* 20 U.S.C.M.A. 79, 42 C.M.R. 271 (1970) (Commanding Officer, Transient Company, Transient Facility, Marine Corps Base, Camp Smedley D. Butler); *U.S. v. Hevner,* 20 U.S.C.M.A. 80, 42 C.M.R. 272 (1970) (same); and *U.S. v. Riley,* 20 U.S.C.M.A. 145, 42 C.M.R. 337 (1970) (same CA as in *Greenwell,* Commanding Officer, Student Company, Schools Battalion, Marine Corps Base, Camp Pendleton).

lished before the Secretary of Transportation issued the then current Convening Authority designation letter in May 1987. The CO of the TACLET, therefore, received his authority to convene SpCMs directly from the Secretary, and there was no question as to the exercise of improper authority by the Commandant. *U.S. v. Almy,* 37 M.J. 465 (CMA 1993). In this case, however, Reserve Center YBI was unquestionably established *after* the Secretary's May 1987 letter; the version still in effect at the time of the trial. However, we are not persuaded that this leads to a different result from that in *Almy,* supra.

■ The May 1, 1987 designation letter represents a personal and complete exercise of the Secretary's discretion. The Secretary clearly delineated between general court-martial (GCM) and SpCM CAs and did not designate any summary court-martial (SCM) CAs. The Secretary decided that all Coast Guard commanding officers, no matter what type of command, should at least be SpCM CAs, but declined to give SpCM CA to officers in charge under Article 23(a)(7) or to create any SCM-only CAs under Article 24(a)(4), UCMJ, 10 U.S.C. § 824(a)(4). Under the circumstances, there was no discretion left for any subordinate to exercise—if a Coast Guard unit is created, which warrants a commanding officer, that officer is a SpCM (not a SCM) CA. Like the Congressional statutory designations, the Secretary made no distinction between presently existing units and those that would be established in the future. The same authority that Congress has to designate CAs, including future ones, was vested in the Secretary without any restrictions on how to exercise that authority.[5] Just as commissioning a new vessel creates a command with SpCM authority under Article 23(a)(5), the creation of a new shore unit should not require a new designation letter by the Secretary under Article 23(a)(7) to invest SpCM authority in the new commanding officer. To hold otherwise

would lead to the rather absurd requirement for the Secretary to repeatedly reissue the same letter, with only the date being new, to account for units coming into existence since the previous designation letter was issued.

### Pretrial Agreement

■ As alluded to earlier, the Appellant contends that the government's move to discharge him under a RIF program violates the provision of his pretrial agreement whereby the CA agreed not to initiate administrative separation based solely on the facts underlying the charges in the case.

From the limited discussion reflected in the summarized record of this trial, it is apparent that the provisions of the pretrial agreement were accepted as clear and unambiguous at the time of trial and that is how we construe them now. The pretrial agreement's clear language is that the CA would not initiate a discharge against the Appellant. The CA remained true to his word and did not request such action. Rather, the Commandant ordered a Service-wide RIF, independent of the Appellant's particular case, and Appellant's discharge was ordered into execution by the CGMPC to fulfill the requirements of the RIF. The restriction in paragraph 11 of the agreement was that the discharge would not be "based *solely* on the *facts underlying these charges*" (emphasis added). The RIF discharge was not based solely on the fact that Appellant stole government funds or signed two false statements; moreover, the discharge was not based even partially on this particular misconduct. It was based on the fact that the Coast Guard needed to reduce its size for budgetary reasons. A special court-martial conviction, which is normally not grounds in itself for an administrative discharge under the Coast Guard Personnel Manual (COMD-TINST 1000.6A), was chosen as one of the ways of identifying those that the Service could no longer afford to retain. The choice

---

5. Article 23(a) simply provides that "Special courts-martial may be convened by—* * * (7) the commanding officer or officer in charge of any other command *when empowered by the Secretary* concerned" (emphasis added), and nothing more. See also *Brown v. U.S.,* 508 F.2d 618, 625 (C.A.3 1974) ("[T]he *Greenwell* rule did not limit the Secretary's discretionary power in this area in any way...."), and *Lucas v. U.S.,* 121 Ct.Cl. 819, 827, 1952 WL 5996 (1952) ("This authorization given by Congress to the Secretary of the Navy without limitation or qualification appears to us to embrace commanding officers of every possible phase of naval activity.").

of wording in paragraph 11 indicates that it dealt only. with command-initiated involuntary discharges and not a Headquarters budgetary initiative which necessitated involuntary discharges of many servicemembers. Therefore, Appellant's RIF discharge does not breach the pretrial agreement.

### Conclusion

The military judge's finding that CO Stationkeepers was in fact a commanding officer of a properly constituted unit was supported by the evidence and not clearly erroneous. The judge's determination that the CO Stationkeepers was a convening authority under Article 23 was correct in law. Appellant's eligibility for a discharge for the convenience of the government under a Service-wide RIF was not precluded by his pretrial agreement. Consequently, we find no legal error warranting relief under Article 69. And, therefore, the Appellant has also failed to show a clear and indisputable right to extraordinary relief. Appellant's appeal is denied, and his petition is dismissed.

Judges BRIDGMAN and WIESE concur.

Judge O'HARA (concurring):

While I generally agree with the opinion of the Court, I feel that the major issues raised in this case deserve further elaboration.

### Convening Authority

In response to the military judge's court order questioning *sua sponte* the convening authority, the government placed in evidence a stipulation of fact, an extract from the Eleventh District's Standard Operating Procedure (SOP), and the testimony of Chief Boatswain's Mate (BMC) Collins who was at the time the Appellant's immediate supervisor. The stipulation of fact provided that:

1. ... [The] primary current assignment [of CDR Shapley, the CA,] is as Chief, Reserve Programs Branch (rs), on the staff of the Commander, Eleventh Coast Guard District [ (CCGD11) ].

2. ... [The Appellant] is assigned as a Reserve Stationkeeper at Reserve Center Yerba Buena Island [ (YBI) ], San Francisco, California.

3. Reserve Stationkeepers are active duty Coast Guard members assigned to Reserve Centers to maintain the Reserve Centers and other Reserve facilities, and to assist the Reserve units that use the facilities in preparations for drills and active duty periods. Stationkeepers are the only regular, active duty Coast Guard members assigned to the Reserve Centers.

4. Commander Shapley serves as Commanding Officer of Reserve Stationkeepers in accordance with the provisions of the Coast Guard Organization Manual (COMDTINST M5400.7C).

5. In this position, Commander Shapley performs all the functions normally associated with a Commanding Officer. He signs Enlisted Performance Reports (marks) as Commanding Officer. He approves, disapproves, and comments on Assignment Data Cards as Commanding Officer. He makes or withholds the Commanding Officer's recommendation for taking of servicewide examinations. He grants leave and liberty. He assigns duties to the Stationkeepers, including assignment of Temporary Additional Duty (TAD). [CCGD11] has authorized Commander Shapley to wear the command ashore insignia for his duties as Commanding Officer, Eleventh District Reserve Stationkeepers [ (CO Stationkeepers) ].

The SOP, which contained a list of the units in the District, did not specifically list CO Stationkeepers [6], but it did list the three Reserve Centers (YBI/San Francisco, San Pedro, and San Diego) over which he exercised command. BMC Collins's summarized testimony was in part:

I am physically located at Reserve Center Yerba Buena Island, but I am also in charge of all units from Monterey to Humboldt Bay [, California]. There are two other stationkeepers who work for me. Petty Officer DeBarrows also works for me. The function of a stationkeeper is to

---

**6.** The SOP's omission of the more obvious "commanding officer also on the staff of another command," the Commanding Officer, Staff Enlisted Personnel, Eleventh Coast Guard District, draws into question the exhaustiveness of this list.

assist the Reserve Commanding Officers. There are 23 drilling reserve units that we support. ... There are three units that drill at Station YBI. ... When Reserve Center Stockton was active Petty Officer DeBarrows was in charge. Stockton has now been decommissioned. * * * During non-drilling times the stationkeepers maintain the building but on weekends the reserves maintain their own spaces. Commander Shapley is my Commanding Officer. * * * If I need to buy supplies for the reserves I forward the requests to [my Executive Officer]....

The trial counsel's brief on the issue included copies of several documents. Secretary of Transportation letter of May 1, 1987, designated the court-martial convening authorities then in effect. An extract from the Coast Guard Organization Manual (COMDTINST M5400.7C), promulgated over the Coast Guard Chief of Staff's signature, provided that the Chief of the Programs Branch (rs) in a District Readiness and Reserve Division, "[w]here applicable [7], serve[s] as Commanding Officer for District Reserve Stationkeepers." And, an extract from the manual entitled "Operating Facilities of the U.S. Coast Guard (OPFAC)" (COMDTINST M5440.2J), promulgated over the Coast Guard Resource Director/Comptroller's signature (who is the immediate subordinate of the Coast Guard Chief of Staff), listed the three Reserve Centers in the Eleventh District, but not CO Stationkeepers.[8] The trial counsel urged that the CO Stationkeepers was authorized to convene this special court-martial on the grounds that he came within the Secretary's designation under Article 23(a)(7).

The detailed defense counsel did not introduce any further testimony or documentation

on the issue. He questioned the military judge's authority to raise the issue at all on the grounds that it was not in the defendant's interest to prevail on the issue since the defendant had negotiated a pretrial agreement with the CA in question. Only in the alternative did the defense argue that the CO Stationkeepers was not a CA within the meaning of Article 23(a)(5), (6), and (7).

I agree that the military judge's findings, which essentially reiterated the stipulation of fact as supplemented by the testimony and the documents, were "fairly supported by the record." *U.S. v. Burris*, 21 M.J. 140, 144 (C.M.A.1985). The stipulation alone showed that CDR Shapley was in a position which was sanctioned by the Commandant's immediate staff[9], through the Coast Guard Organization Manual, as a command called CO Stationkeepers and which was recognized as such also by CCGD11, the officer exercising general court-martial jurisdiction over the command, and that CDR Shapley functioned as a commanding officer. Under the circumstances, the judge properly concluded that CDR Shapley was a commanding officer. As Chief Judge Everett recognized in his concurring opinion in *U.S. v. Jette*, 25 M.J. 16, 19 (C.M.A.1987), "... the real issue is who actually functioned and was recognized as commander at the time of the relevant events."

Nevertheless, the defense argued before us that we should reexamine whether CO Stationkeepers was a command or a unit. While there are many Coast Guard units without commanding officers, which are headed by enlisted officers in charge, in the present case, the command and unit issues are intertwined in that this commissioned officer must in fact command some people who when considered as a whole form a unit.

7. In the absence of evidence to the contrary, I construe this provision as being applicable whenever active-duty personnel are assigned as Reserve Stationkeepers to units outside the District Office.

8. As with the SOP, the OPFAC Manual also omitted other "commanding officers also on the staff of another command," such as the Commanding Officers of District Staff Enlisted Personnel, which are designated as CAs by the Secretary's letter of May 1, 1987.

9. The Commandant's immediate staff includes the Vice Commandant and the Chief of Staff and their staffs. This is the level that is normally responsible for creating, modifying, and disbanding Coast Guard units. Coast Guard Organization Manual 1.B.4.a (COMDTINST M5400.7D) ("The Commandant or Chief of Staff are the approving authorities of the following actions for all organizational elements described in this manual: ... Reorganizations (changes to organizational structure)...."); see 14 U.S.C. §§ 93(b), (c), (l) & (q) and 632.

It is true that jurisdiction cannot be waived by the accused. R.C.M. 907(b)(1)(A). However, that does not mean that this Court is required to reconsider *de novo* the factual predicate for the jurisdictional determination. This is particularly so when the primary vehicle for establishing the jurisdictional facts, as in this case, was a stipulation of fact, voluntarily entered into by the accused. The Appellant stipulated to CDR Shapley being assigned to a position designated by the Commandant's immediate staff as a command and recognized as such by the officer exercising general court-martial convening authority over the command and performing all of the functions normally associated with a commanding officer. "No injustice exists in denying the accused leave to contradict his stipulation at this level, and in holding that he is now estopped by his original consent to that jurisdictional stipulation." *U.S. v. Garcia*, 5 U.S.C.M.A. 88, 97, 17 C.M.R. 88, 97 (1954).

Even if the defense argument that CO Stationkeepers is not a command is treated as a matter of law, rather than of fact, the result is the same. The function of creating, changing, and closing units is vested with the Commandant and his immediate staff. Footnote 9. This Court is ill-equipped to deal with the policy questions involved with whether a particular command is appropriate under the circumstances.

> We reject any such assessment as beyond the scope of our power of review. ... What kind of commands should be established, and what general duties and responsibilities the commanders of those units should have, are administrative matters which rest with the military. As meager as the functions entrusted to a unit may be, the decision to establish the unit as a part of the naval structure is not subject to review by this Court.
>
> * * * As [was] observed in United States v. Hooper, 5 USCMA 391, 394–395, 18 CMR 15: "[T]he military effort may require the formation of numerous commands for special purposes. These may not, and frequently do not, fit into a fixed pattern of military units."

*U.S. v. Surtasky*, 16 U.S.C.M.A. 241, 36 C.M.R. 397, 399 (1966). I find no moment to the fact that the command here was recognized in the Organization Manual, rather than being assigned a separate OPFAC number, like its three subordinate units, when CCGD11 on which the CA was a staff member already had an OPFAC number. Those normally responsible for creating units still authorized CO Stationkeepers as a command. Footnote 9. The failure to follow a particular procedure in creating a command is not dispositive; the Service has the flexibility to manage its structure in whatever way is deemed appropriate without courts attaching jurisdictional significance to a particular process. See *U.S. v. Jette*, 25 M.J. 16, 18 (C.M.A.1987) ("[W]e are not justified in attaching jurisdictional significance to service regulations in the absence of their express characterization as such by Congress."). Moreover, the fact that the CA's primary duty was as a staff officer also does not undermine CO Stationkeepers as a commanding officer. "Duality of duty in the military is commonplace. It does not import error into court-martial proceedings against an accused, if it does not result in denying him a right to which he is entitled." *U.S. v. Surtasky*, *supra* 36 CMR at 400.

The Appellant agreed by stipulation of fact that CDR Shapley was assigned to the position of CO Stationkeepers, a command specifically authorized by the Chief of Staff of the Coast Guard (who is normally responsible for new units), that CDR Shapley "performed all functions normally associated with a Commanding Officer," and that he was recognized as such by the officer exercising general court-martial jurisdiction over the command. Furthermore, there has been no evidence to suggest that the command in question was created by someone without authority to do so, that the person exercising command authority was not authorized to do so, or that the command was a command in name only. No one in the chain of command has thus far questioned CO Stationkeepers as a command or the exercise of command authority by CDR Shapley. Under the circumstances, I am satisfied that CO Stationkeepers was appropriately recognized by the Service as a command, that it functioned as a command,

and that it was commanded by a person with apparent authority to be in command.

One would think that once the crucial fact of command is established, the question would generally come down to what level of court is this officer empowered to convene; i.e., flag officers in command usually convene general courts-martial (GCMs) and other officers in command convene special (SpCMs) or summary courts-martial (SCMs) as appropriate. The terse discussion in R.C.M. 504(b) and the dearth of case law construing the statutory designations [10] would seem to support such a view. However, there have been occasions, although infrequent, where a CA's authority has been found wanting.[11] Consequently, in the face of any uncertainty about the precise reach of the statutory CA designations, the majority of the cases rely upon Secretarial designations for CA authority.[12] In either case, I was unable to discern a Congressional intent or public policy for denying some commanding officers CA authority; such authority is not an unusual, if not an essential, attribute of command.[13]

**10.** E.g.: *U.S. v. Ortiz [I]*, 15 U.S.C.M.A. 505, 36 C.M.R. 3 (1965), construed Article 23(a)(5) & (6). In *U.S. v. Kugima*, 16 U.S.C.M.A. 183, 36 C.M.R. 339 (1966), it was recognized in passing that a Marine division was covered by Article 22, UCMJ, 10 U.S.C. § 822, but the real issue was whether the person who convened the court had in fact succeeded to command of the division. *U.S. v. Jette*, 25 M.J. 16 (C.M.A.1987), was another succession to command case involving an Air Force support group commander which is a CA under Article 23(a)(4). *U.S. v. Smith,* 197 U.S. 386, 25 S.Ct. 489, 49 L.Ed. 801 (1905) (The commander of a fleet was statutorily provided with GCM convening authority.). Even the President's authority to convene has been questioned. *Swaim v. U.S.*, 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897).

Article 23 was basically a combination of the CA provisions under the Articles of War and the Articles for the Government of the Navy prior to the enactment of the Code. Judge Kilday highlighted this fact in his dissent in *U.S. v. Ortiz [II]*, 16 U.S.C.M.A. 127, 36 C.M.R. 283, 291–92 (1966), reviewing the legislative history of Article 23, which the Court in *U.S. v. Ortiz [I]*, 15 U.S.C.M.A. 505, 36 C.M.R. 3, 6 (1965), had already noted was "scanty". The principal focus in the Code's legislative history on Articles 22–24 was not what commands should be able to convene what level of court-martial, but whether the power to convene a court-martial should be a command function at all. See, e.g., footnote 13.

**11.** E.g., *U.S. v. Cunningham*, 21 U.S.C.M.A. 144, 44 C.M.R. 198 (1971) (following *Greenwell*); *U.S. v. Greenwell*, 19 U.S.C.M.A. 460, 42 C.M.R. 62 (1970) (rejecting a Secretarial delegation which tried to overcome the second *Ortiz* decision); *U.S. v. Ortiz [II]*, 16 U.S.C.M.A. 127, 36 C.M.R. 283 (1966) (on rehearing, the Secretarial delegation under Article 23(a)(7) could not be read to reach a Marine company commander); *U.S. v. Ortiz [I]*, 15 U.S.C.M.A. 505, 36 C.M.R. 3 (1965) (a Marine company commander was not a SpCM CA under Article 23(a)(5)–(7)).

**12.** E.g., *U.S. v. Almy*, 37 M.J. 465 (C.M.A.1993); *U.S. v. Yates*, 28 MJ 60 (C.M.A.1989); *U.S. v. Masterman*, 22 U.S.C.M.A. 250, 46 C.M.R. 250 (1973); *U.S. v. Cunningham*, 21 U.S.C.M.A. 144,

44 CMR 198 (1971); *U.S. v. Greenwell*, 19 U.S.C.M.A. 460, 42 C.M.R. 62 (1970); *U.S. v. Surtasky*, 16 U.S.C.M.A. 241, 36 C.M.R. 397 (1966); *U.S. v. Ortiz [II]*, 16 U.S.C.M.A. 127, 36 C.M.R. 283 (1966); *U.S. v. Hooper*, 5 U.S.C.M.A. 391, 18 C.M.R. 15 (1955) (Presidential delegation to the Secretary of Defense to designate GCM CAs); *U.S. v. Bunting*, 4 U.S.C.M.A. 84, 15 C.M.R. 84 (1954); *Lucas v. U.S.*, 121 Ct.Cl. 819 (1952); and *Givens v. Zerbst*, 255 U.S. 11, 41 S.Ct. 227, 65 L.Ed. 475 (1920) (Presidential designation).

Congress may have intended the primacy of Secretarial designations with the lack of concern about the exhaustiveness or precision of the statutory designations when the Code was being enacted. For example, when it was pointed out during the House hearings that the Commandant (or any other Coast Guard officer) was not listed as GCM CA in Article 22, it was handled by merely noting that the Secretary could easily remedy the omission by using his designation authority. *Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the House Comm. on Armed Services*, 81st Cong., 1st Sess. 1136–37 (1949) [House Hearings].

**13.** "Central to court-martial practice is the commander and the chain-of-command. Despite repeated proposals to modify the system, the commander, whether at the company or corps level, still serves as the keystone for the operation of the military criminal process." Schlueter, Military Criminal Justice 1–8(A) (3d ed. 1992) (footnotes omitted). Colonel Wiener in his testimony before the House Subcommittee considering the then proposed UCMJ supported the continuance of command convening authority and went so far as to suggest that "[t]here have been decisions that you cannot take the power of the appointment of courts away from the commander," citing *Swaim v. U.S.*, 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897) (upholding Presidential convening authority without a statute). House Hearings at 782. And, more recently in *U.S. v. Jette*, 25 M.J. 16, 18 (C.M.A.1987):

The power to convene a court-martial, appoint or replace members, and approve findings and sentence is a power that Congress has tradi-

There may be some question as to the level of CA authority.[14] But concern over the level of CA authority should not result in ousting a commanding officer of any CA authority.[15] Therefore, I believe that grants of CA authority should be liberally interpreted to give commanding officers convening authority unless it is clear that the authority was withheld or that no fair construction of the designation would permit the command in question to be a CA.

Article 23(a) provides[16]:

Special courts-martial may be convened by—* * *

(5) the commanding officer of any naval or Coast Guard vessel, shipyard, base, or station; ...;

(6) the commanding officer of any separate or detached command or group of detached units of any of the armed forces placed under a single commander for this purpose; or

(7) the commanding officer or officer in charge of any other command when empowered by the Secretary concerned.

tionally reserved for command. *See* W. Winthrop, *Military Law and Precedents* 65–68 (2d ed. 1920 Reprint); G. Davis, *A Treatise on the Military Law of the United States* 18–19 (3d ed. 1913). Its concern is not technical, but functional, because military justice plays an important role in the readiness of our servicemembers to wage war. *See United States v. Kugima*, 16 U.S.C.M.A. 183, 186, 36 C.M.R. 339, 342 (1966); *United States v. Bunting*, 4 U.S.C.M.A. 84, 88, 15 C.M.R. 84, 88 (1954). See also *Brown v. U.S.*, 508 F.2d 618, 625 & 626 n. 8 (CA3 1974), and *Lucas v. U.S.*, 121 Ct.Cl. 819, 827, 1952 WL 5996 (1952) ("This authorization given by Congress to the Secretary of the Navy without limitation or qualification appears to us to embrace commanding officers of every possible phase of naval activity.").

However, there is language in *U.S. v. Greenwell*, 19 U.S.C.M.A. 460, 42 C.M.R. 62, 65 (1970), that SpCM convening authority should be "conferred sparingly". This conclusion was based solely on the wording of Article 23(a) without further citation to legislative history or case law.

**14.** See *U.S. v. Ortiz [I]*, 15 U.S.C.M.A. 505, 36 C.M.R. 3 (1965), where in rejecting that a Marine company commander was a SpCM CA, the Court noted that similar units of the Army and the Air Force are only statutorily provided with SCM CA by Article 24. The Court did not also note that no sea Service command is provided with SCM authority unless it is already a SpCM CA or designated SCM CA by the Secretary. Article

Other than Secretarial designations and separate or detached commands, the SpCM authority for the Coast Guard and the Navy rests entirely within Article 23(a)(5)'s phrase, the commanding officer of any "vessel, shipyard, base, or station". I agree with the majority that like "vessel" which encompasses any ship, cutter, or boat within the Navy and Coast Guard (see 1 U.S.C. § 3), "shipyard, base, or station" should also be construed as generic terms. I also agree that in the Coast Guard, "station" is traditionally used to refer to smaller shore units and the fact that the command here consisted of a group of stations, instead of one, does not undermine CO Stationkeepers from being a commanding officer of a station under Article 23(a)(5). The military judge held as much when he found that "Commander Shapley serves as Commanding Officer, Coast Guard District Eleven Reserve Stationkeepers and as such is the Commanding Officer of Coast Guard Reserve Center Yerba Buena Island."

Under Article 25(a)(6), "separate or detached commands" and commanding officers

24(a). The Court also argued that: "As auguring against such an approach, we note the authorized officer strength of the company is barely sufficient to furnish the requisite three-member panel and counsel for both sides." However, the Court later recognized that difficulty in exercising CA authority does not preclude the granting of the authority. *U.S. v. Surtasky*, 16 U.S.C.M.A. 241, 36 C.M.R. 397, 399 (1966) ("That a commander may encounter great difficulty in finding a sufficient number of qualified persons to constitute a particular court-martial does not, however, divest him of the power to convene the court."). The Secretarial designations in this case provided for only GCM and SpCM CAs; she did not designate any SCM-only CAs.

**15.** In *U.S. v. Ridley*, 22 M.J. 43, 45 (C.M.A.1986) (construing Article 23(b)), even though it was unclear under which subsection of Article 23(a) the Commander of the Air Force Office of Scientific Research fell, the Court was "unconvinced that, as the Government suggests, [its commander] Colonel Baker lacked the power to convene a special court-martial...." See also footnote 13.

**16.** The provisions of Article 23(a)(1)–(4) are inapplicable because they deal with the power of GCM CAs to also convene SpCMs and with CA authorities in the Army and Air Force. The omitted portion of (a)(5) discusses Marine Corps SpCM CAs.

of a "group of detached units" are SpCM CAs.[17] Article 23(a)(6) was briefly reviewed in *U.S. v. Ortiz [I]*, 15 U.S.C.M.A. 505, 36 C.M.R. 3 (1965), rehearing denied in *U.S. v. Ortiz [II]*, 16 U.S.C.M.A. 127, 36 C.M.R. 283 (1966). The Court found that the Marine company in question was not a "separate or detached command" within meaning of Article 23(a)(6). However, the Court insisted that the case was essentially limited to its facts. 36 CMR at 7; reemphasized on rehearing, 36 CMR at 284.[18] With this uncertainty raised and in the absence of any statutory clarification of what Congress intended by "separate or detached" (see 10 U.S.C. §§ 101 & 801), R.C.M. 504(b)(2) is an attempt to fill the void.[19] My interpretation of Article 23(a)(6) is that when military necessity requires the creation of a command which is "separate or detached" or a "group of detached units", as explained in R.C.M. 504(b)(2)(A), the command is also a CA under Article 23(a)(6).[20] CO Stationkeepers was created by the Commandant as a separate umbrella command, attached to the District staff in Long Beach, California. CO Stationkeepers was responsible for three detached units in YBI/San Francisco, San Pedro, and San Diego, California. CO Stationkeepers was a "separate or detached" command or a "group of detached units" within the meaning of Article 23(a)(6).

While CO Stationkeepers's authority to convene this court is sustainable under the statutory designations of Article 23, I agree with the majority that the lack of clear precedent interpreting the statutory designations makes Secretarial designations under Article 23(a)(7) the source of choice for CA authority. The Secretary's letter of May 1, 1987, designated "Commanding Officers of all Coast Guard units" as SpCM CAs. That designation applied to CO Stationkeepers as a commanding officer of a Coast Guard unit and made him a SpCM CA. Notwithstanding, the defense asserts that under *U.S. v. Greenwell*, 19 U.S.C.M.A. 460, 42 C.M.R. 62 (1970), and subsequent cases cited in footnote 4, the Secretary's authority to create SpCM CAs is nondelegable and that the May 1, 1987, letter designating all Coast Guard unit commanding officers as SpCM CAs was a *de facto* abdication of designation authority to the Commandant and his immediate staff.

Although the Court in *Greenwell* talked in terms of improper delegation[21], the decision actually involved an inoperative Secretarial designation to a command whose basis for existence was the Secretarial designation as implemented by a subordinate. Other than the subordinate's implementation of the Secretarial designation, there was no other evi-

17. There is an argument that the courts should have considered this provision in *U.S. v. Almy*, 34 M.J. 1082 (C.G.C.M.R.1992), *aff'd* 37 M.J. 465 (C.M.A.1993), in which the Secretarial designation was solely relied upon in determining whether the Coast Guard Pacific Area Tactical Law Enforcement Team was a CA.

18. But see *U.S. v. Cunningham*, 21 U.S.C.M.A. 144, 44 C.M.R. 198 (1971), in which the Court found the *Greenwell* Secretarial delegation also wanting with respect to the Commanding Officer, Enlisted Personnel, Headquarters Eighth Naval District, but did not reexamine whether this different type of command was a CA under Article 23(a)(5) or (6).

19. However, R.C.M. 504(b)(2)(B) on who may determine when a command is separate or detached should be read in light of *U.S. v. Greenwell*, 19 U.S.C.M.A. 460, 42 C.M.R. 62 (1970). See the main text discussion following footnote 21.

20. With Article 23(a)(5) covering those commands which are intimately connected with run-

ning vessels or shore facilities, Article 23(a)(6) was apparently meant to reach commands whose missions do not involve operating vessels or shore facilities. However, with the catchall nature of (a)(6)'s wording, some overlap is inevitable.

21. See the delegability discussion in footnote 23. In *U.S. v. Cunningham*, 21 U.S.C.M.A. 144, 44 C.M.R. 198, 199–200 (1971) (emphasis added), the Court in following *Greenwell* used some loose language in reaching its conclusion: "However, inasmuch as we believe that *his [the Secretary's] personal action is an absolute prerequisite*, we must hold that the court-martial which convicted this accused was without jurisdiction to proceed and, hence, was a nullity. United States v. Greenwell...." This language has been misinterpreted, as the defense did in this case, as suggesting that the authority of the Secretary is a personal, nondelegable judicial duty. If the requirement for the Secretary's personal involvement were taken to its logical extreme, a new designation should be required whenever a new person takes office as Secretary—fortunately not the situation.

dence that the command in *Greenwell* was recognized or functioned as a command. The Secretarial designation created a logical anomaly by incorporating separate and detached commands within an Article 23(a)(7) designation. Separate or detached commands are already covered by Article 23(a)(6), an independent grant of CA authority, requiring no further Secretarial action to be effective. The Court had already held in *U.S. v. Ortiz [I]*, 15 U.S.C.M.A. 505, 36 C.M.R. 3 (1965), that a Marine company was not a separate or detached unit within the meaning of Article 23(a)(6). So, the Secretary could not "confer [SpCM CA] authority by the simple expedient of declaring a unit ... is separate and detached." 42 C.M.R. at 65. While the Court couched its decision in terms of an improper delegation, the holding of the case was that a flag officer cannot make a unit separate or detached simply by saying so, especially a unit that had already been judicially determined not to be separate or detached. A "separate or detached command" must have meaning independent of someone just designating it as such. Otherwise, Article 23(a)(6) is redundant with (a)(7) as a Secretarial designation by another name—a disfavored statutory construction since it renders part of a statute merely surplusage. With Article 23(a)(6) already fully covering separate or detached commands, the *Greenwell* Secretarial designation was ineffective as unnecessary.

The Secretarial designation here makes no attempt at authorizing subordinates to create units for CA purposes only or at interpreting other provisions of Article 23. The Secretary personally decided *who* in the Coast Guard should be CAs: all Coast Guard commanding officers are at least SpCM CAs. Notwithstanding, the defense urged in his reply brief: "Although the Secretary could lawfully designate Commanding Officer, Eleventh District Reserve Stationkeepers ... or commanding officers of all District Reserve Stationkeepers, the Secretary can-

not designate all commanding officers." In essence, the defense is arguing that Article 23(a)(7) should be read as "the commanding officer ... of any other command when empowered by the Secretary ..." *by unit name or type*. By adding such a judicial gloss to the statute, the court would be substituting its judgment for the Secretary's as to the most appropriate way to designate CAs. The statute vests the Secretary with the discretion, not this Court. The statute without restriction permits the Secretary to empower commanding officers and officers in charge, not just particular units or types of units with commanding officers or officers in charge. Footnote 5. That Secretarial discretion was exercised to give all Coast Guard commanding officers SpCM convening authority. Mandating formal Secretarial recognition only after a command is created to make its commanding officer a CA is of questionable value to the courts-martial process in the face of an already clear Secretarial intent to do so no matter what kind of command it is. Where it is not required by the Code, I do not believe in judicially imposing a procedure on the Secretary and the Service where it is without readily apparent benefit to the system or potential accuseds.

Moreover, I find nothing in the statute or the legislative history to suggest that Congress intended only for the statutory designations to cover future commands.[22] Dynamic times can require novel commands to deal with particular situations. It would be imprudent for the Secretary not to anticipate the need for such commands and their need to have court-martial convening authority, rather than just reacting on a case-by-case basis in a crisis mode to provide for such authority. The fact that the Secretary may not be able to anticipate what the particular kinds of units will be or what they might be called are not rational grounds for denying the Secretary the flexibility to be proactive in meeting potential future needs for convening

**22.** If that were the case, the statutory designations should be more comprehensive than they are. The sea Services do not have any statutory designations covering SCM-only CAs and the Coast Guard is also without any statutory designations for GCM CAs. Articles 22 & 24; see footnotes 10 & 12. Moreover, it would be some-

what ironic to hold in light of the *Ortiz–Greenwell–Cunningham* line of cases, which cast doubt on the meaning of the sea Services SpCM statutory designations, that *in futuro* designations are not within the Secretary's powers to remedy any shortcomings in the statutory designations. See footnotes 11, 14, 18 & 21.

authority. Limiting the Secretary's discretion to just ratifying the convening authority of only existing units would undermine the major reason for having Secretarial designations: "To provide for the unforeseen, Congress authorized the service Secretaries to fill the gaps in those instances where they believed it was necessary." *U.S. v. Greenwell,* 19 U.S.C.M.A. 460, 463, 42 C.M.R. 62, 65 (1970). I have found nothing to suggest that filling the gaps should only be done after the fact. The same authority that Congress has to designate CAs was vested in the Secretary without any restrictions. Footnote 5. Since Congress can cover future units, so can the Secretary who has been given the same power that Congress has. I agree that the Secretarial designation under Article 23(a)(7) in question is not a delegation, and it does not become one merely because the Secretary may not also be formally involved in creating new commands.[23]

I encourage the efforts of the Secretary in the face of a lack of clear direction in the Code, Manual, or case law to infuse some order in this area with the use of designations under Articles 22–24, including using such designations to reach future units. And, where the designations neither undermine the military justice process nor impinge upon the accused's right to a fair trial, there has been no abuse of discretion, and the Secretary's designations should be upheld. That is what the Court does here.

### Pretrial Agreement

The military judge, as part of the plea inquiry, determined the parties' understanding of the pretrial agreement, which was summarized as follows:

The military judge explained fully each and every provision of the agreement and ascertained that the accused fully understood all the provisions of the agreement.

With agreement of both counsel paragraph 12 of Appellate Exhibit V [the pretrial agreement without the sentencing limitations] was amended to read future "favorable" recommendation for reenlistment.[24] Both counsel agreed that Commander Shapley [the CA], and his successor were bound to that agreement, but that the agreement did not bind any other command to which the accused may be assigned. * * *

Counsel for both sides stated that their understanding of the Pretrial Agreement comported with that of the military judge. The military judge further stated that he considered the Agreement to be in accordance with appellate case law, public policy, and his own notions of fundamental fairness.

---

**23.** Even if the Secretary's letter of May 1, 1987, is considered a delegation of authority to designate CAs, I am not convinced that such a delegation is impermissible. The Court of Military Appeals has previously recognized in *U.S. v. Hooper,* 5 U.S.C.M.A. 391, 395–96, 18 C.M.R. 15, 19–20 (1955), that:

> [W]e are certain that the authority to empower a commanding officer to convene a general court-martial is delegable. Undeniably, judgment is required in determining the advisability of investiture, but the nature of that judgment is not in any sense judicial. Cf. *Runkle v. United States,* 122 US 543, 80 L ed 1167, 7 SCt 1141 [(1887)]. Therefore, the authority to empower, granted by Article 22(a)(7) [now (9)] to the President, is legally delegable by him to the Secretary of Defense.

Notwithstanding, the Court in *U.S. v. Greenwell,* 19 U.S.C.M.A. 460, 42 C.M.R. 62 (1970), found nondelegability implied by the failure of Congress to expressly allow delegation, like it had done with the President in Article 140, UCMJ, 10 U.S.C. § 940. However, such implied prohibitions against delegation are no longer favored in the law; the courts now permit delegations when Congress has authorized delegation or when the statute is silent on the matter. Davis and Pierce, Administrative Law Treatise 86–88 (3d ed. 1994). Although the Code does not specifically permit the Secretary to delegate the authority to designate CAs, it does not prohibit it either. Moreover, just because the Code is silent on the Secretary's ability to delegate, that does not mean that Congress has not spoken elsewhere: "The Secretary is authorized to confer or impose upon the Commandant any of the rights, privileges, powers, or duties, in respect to the administration of the Coast Guard, vested in or imposed upon the Secretary by this title or *other provisions of law.*" 14 U.S.C. § 631 (emphasis added). If the Secretary's CA designation is a delegation, the Secretary had the authority to so delegate.

**24.** Paragraph 12 originally read: "The convening authority agrees to make a future recommendation for my reenlistment, as long as my performance warrants and I am involved in no other incidents of misconduct."

The pretrial agreement also contained a provision as paragraph 11 that: "The convening authority agrees not to initiate administrative separation based solely on the facts underlying these charges." The military judge accepted as provident the Appellant's pleas of guilty, and he was convicted in accordance with his pleas.

Most of the authority to administratively discharge members has been consistently retained at the Headquarters level. Coast Guard Personnel Manual 12.B (COMDTINST 1000.6A). No special discharge authority has been provided commanding officers as CAs. In most cases, commands desiring to discharge a member must request Headquarters to do so and accompany the request with the necessary factual support. Without a request being initiated by a command, Headquarters normally does not initiate discharges on its own. This is the well-known state of affairs in which the accused and the CA negotiated the pretrial agreement. The pretrial agreement's clear language is that the CA would not initiate a discharge against the Appellant, and he did not. The Commandant ordered the Service-wide reduction in force (RIF), independent of the Appellant's particular case, and Appellant's discharge was ordered into execution by the Coast Guard Military Personnel Command (CGMPC) [25] to fulfill the requirements of the RIF. The only provision which the record reflects that the military judge thought needed clarification was the CA's commitment in paragraph 12 on the accused's reenlistment recommendation, a matter completely within the CA's control. The parties agreed that the CA was binding himself and his successors, but not other commands. Moreover, paragraph 7 of the pretrial agreement indicates that the accused fully understood that CA's commitment not to discharge him was not binding on others:

> 7. That my counsel has fully advised me of the meaning and effect of my guilty plea and that. I fully understand the meaning thereof and all its attendant effects and consequences, *including the possibility that I may be processed for an administrative discharge, even if part or all of the sentence, including a punitive discharge, is suspended or disapproved pursuant to this agreement.*

(Emphasis added.) [26] This paragraph recognizes that the Appellant could still be subjected to administrative discharge action, but paragraph 11 made it clear that it would not be initiated by the CA. The CA carefully limited the agreement to things he was personally authorized to do. The CA confirmed as much in a post-trial affidavit submitted as part of the government's brief.

Notwithstanding the clear wording as to whose actions were curtailed by the pretrial agreement, the defense urged that this Court should read "convening authority" to mean the whole government. CAs certainly speak for the government with respect to matters within their area of responsibility, but they may not act for the government regarding matters not entrusted to them.[27] Even if the government could be said to be bound by the apparent authority of its agents, there must be at least a colorable demonstration of having the necessary authority, upon which the accused reasonably relied to his or her detriment. See *Cooke v. Orser*, 12 M.J. 335

---

**25.** The CGMPC is a headquarters unit which is responsible to the Commandant for carrying out the Coast Guard's personnel programs.

**26.** This specific language was noted in *U.S. v. Miles*, 12 M.J. 377, 379 (C.M.A.1982): "a pretrial agreement may appropriately contain a disclaimer like that now being used in the Navy, *see United States v. Miller*, 7 M.J. 535, 537 (N.M.C.M.R.1979), (Cedarburg, C.J., concurring), which makes clear that the accused may be processed for an administrative discharge even if a punitive discharge is suspended or disapproved pursuant to the agreement." The language was developed to avoid the result in *U.S. v. Santos*, 4 M.J. 610 (N.C.M.R.1977), where an administra-tive discharge was impliedly precluded by the pretrial agreement under the circumstances.

**27.** See *U.S. v. Cabral*, 20 M.J. 269, 272 (C.M.A. 1985) (emphasis added), in which the Court, in construing a pretrial agreement in light of an automatic reduction action, stated: "[W]e perceive· no reason why a convening authority is precluded from obligating himself in a pretrial agreement concerning a court-martial to take prescribed administrative action for the accused's benefit, *so long as that action is within the convening authority's power.*" Cf. *U.S. v. Koopman*, 20 M.J. 106 (C.M.A.1985) (the officers who negotiated with the defendant were legal representatives of the CA).

(C.M.A.1982); *U.S. v. Brown*, 13 M.J. 253 (C.M.A.1982). The pretrial agreement here consistently uses the term "convening authority" and not some broader language, such as the "United States," the "Coast Guard," or the "government." Nothing brought to this Court's attention indicates that CO Stationkeepers was purporting to act for higher authority. The defense did bring to the Court's attention the recent case of *Thomas v. I.N.S.*, 35 F.3d 1332 (C.A.9 1994), as supporting his argument that CAs' promises, like those of U.S. Attorneys, bind the whole government. This case and the more recent case of *Margalli–Olvera v. INS*, 43 F.3d 345 (CA8 1994), found that agreements made by U.S. Attorneys regarding deportation proceedings without INS involvement were still binding on the INS. Neither of those cases supports the defense in this case even if it could be said the authority of CAs is synonymous with that of U.S. Attorneys.[28] The agreements in those cases used general terms, such as "Government" (that was defined in the agreement as including U.S. departments and agencies) in the *Thomas* case and "United States" in *Margalli–Olvera*. Those courts made it clear that they would construe agreements broadly in the accused's favor unless the agreement used specific language limiting who was bound. The pretrial agreement in this case used specific language, "[t]he convening authority agrees not to initiate administrative separation. . . ."

Even if it could be said that the agreement was binding on the Commandant and the CGMPC, the defense is also asking this Court to give the agreement language that the discharge could not be "based solely on the facts underlying these charges" an expansive reading to mean that the Coast Guard agreed not to administratively discharge him for any reason, even in a RIF situation, if this court-martial conviction was implicated. Such a broad reading would create a protected class for some people with court-martial convictions. The consequence

being that the Commandant would have to look to other servicemembers, whose conduct has not warranted a court-martial conviction, to be involuntarily discharged to meet necessary personnel reductions, while retaining those members whose court-martial convictions were obtained with a pretrial agreement covering administrative discharges. It puts the Appellant in a better position than the rest of the Coast Guard's members who do not have any assurances that they will not be affected by a Service-wide RIF. I decline to construe the pretrial agreement in manner so as to give the Appellant broader rights than his fellow servicemembers. By its plain terms, the pretrial agreement covered solely individual discharge actions using the court-martial misconduct as its motivation and basis. The defense asks too much by urging this Court to infer an exemption for the Appellant from general personnel policy changes.

From the post-trial affidavits of the CA and the Appellant submitted by the defense in support of its petition, Appellant's discharge from the Coast Guard was not intended by the CA, and both the Appellant and the CA believed that a discharge would not occur in light of the policies in force at the time the agreement was signed. The CA also indicated in his affidavit for the government that, if he knew then what he knows now, he would have dealt with Appellant's case differently. Appellant's real complaint on appeal is not that he did not get the benefit of his bargain, but that there were collateral consequences to his court-martial conviction which were unanticipated at the time of trial. The RIF was a supervening event, not addressed at all by the pretrial agreement. None of the parties foresaw the possibility of a Service-wide RIF in which the Commandant would be compelled to resort to involuntary administrative discharges. That lack of clairvoyance is not grounds for relief. *U.S. v. Albert*, 30 M.J. 331 (C.M.A.1990); *U.S. v. Bedania*, 12 M.J. 373 (C.M.A.1982).

---

**28.** I do not believe it is. Both cases held that actual authority, which the courts found the U.S. Attorneys had, was necessary to bind the United States, the doctrines of estoppel and apparent

authority normally being insufficient to do so. As already noted, Coast Guard CAs do not normally have administrative discharge authority.

*Conclusion*

Appellant's case reminds me somewhat of a "monkey's paw" wish.[29] He originally wanted the military judge to find that the court was properly convened and that his pleas were provident, so he could benefit from the pretrial agreement that he had negotiated with the CA. But now, he believes otherwise. While the vagaries of the future unknown makes Appellant's frustration with its outcome understandable, it is not legal error. The suggestion that the RIF policy as applied to the Appellant's particular situation is ill-advised is also not legal error. I agree with the majority that Appellant has not presented any legal errors warranting relief. Appellant's appeal is properly denied, and his petition dismissed accordingly.

**29.** "The Monkey's Paw" by W.W. Jacobs is the short story version of the warning: Be careful of what you wish for because you may get it. Cerf & Moriarty eds., An Anthology of Famous British Stories 462 (The Modern Library 1952).